**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SUSAN B. LONG and DAVID BURNHAM,**

                    **Plaintiffs,**

          **v.**                                    **5:06-CV-1086**
                                                    **(NAM/GHL)**

**UNITED STATES DEPARTMENT OF JUSTICE,**

                    **Defendant.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

Ropes & Gray LLP                    William I. Sussman, Esq.
1211 Avenue of the Americas         Thomas M. Susman, Esq.
New York, New York 10036-8704       Tal Kedem, Esq.
Attorneys for Plaintiff

U.S. Department of Justice          Kathryn L. Wyer, Esq
Civil Division
20 Massachusetts Avenue NW
P.O. Box 883 Ben Franklin Station
Washington, DC 20044

Richard Hartunian
United States Attorney
100 South Clinton Street
Syracuse, NY 13261-7198
_Attorney for Defendant_

**Hon. Norman A. Mordue, Chief Judge:**

**MEMORANDUM DECISION AND ORDER**

**I.      INTRODUCTION**

        Plaintiffs Susan B. Long and David Burnham bring this action pursuant to the Freedom of

Information Act ("FOIA"), 5 U.S.C. § 552, to challenge the response by defendant, the United

States Department of Justice ("DOJ"), to their FOIA requests for records from or relating to the

DOJ Civil Division's ("the Division") case management system database ("CASES"). Plaintiffs allege that: the search defendant conducted for information responsive to their FOIA request was inadequate; the FOIA exemptions pursuant to which defendant withheld certain records are inapplicable; defendant failed to conduct a segregability analysis and release all reasonably segregable information; and defendant failed to mark redactions with regard to sealed cases. Plaintiffs seek injunctive and "other appropriate relief" to obtain the records and descriptive information relating to the CASES database they claim defendant wrongfully withheld. Presently before the Court are defendant's motion for summary judgment and plaintiffs' cross motion for summary judgment.

## II.      BACKGROUND

### A.      TRAC

In 1989 plaintiffs founded Transactional Records Access Clearinghouse ("TRAC"), a data gathering, data-research and data-distribution organization at Syracuse University. According to plaintiffs, TRAC was established to provide the public with comprehensive information about the federal government's staffing, spending, enforcement and regulatory activities. Plaintiffs further state that TRAC's goal is to improve the functioning of representative democracy in the United States by providing the public with authoritative information about the working of the federal government. Plaintiffs aver that FOIA is the primary tool they use to collect information about the government. Plaintiffs state that once a FOIA request is processed and a government agency releases responsive information, TRAC analyzes the data to describe the extent the agency's activities correspond with the agency's stated goals, and ascertain the trends and geographic distribution of important government activities. According to plaintiffs, TRAC's analyses and

underlying data are available to Congressional committees, news organizations, public interest groups, the public at large, as well as to government institutions, such as the Government Accountability Office, Supreme Court Library, and agency inspector generals' offices.  Plaintiffs state that academics also use TRAC's analysis in their own research and publications.

### B.      CASES

Dorothy Bahr, Director of the Civil Division's Office of Management Information ("OMI"), stated in her declaration that CASES is the "current computerized case information system used for tracking basic data on filed civil cases as well as unfiled matters handled in the various litigating components (Branches and Sections) of the Civil Division."  Bahr explained that "the data in CASES is stored in a number of different tables in a relational database structure that operates on a Microsoft Structured Query Language ("SQL") server back end, with a third party software, Lawpack, as the user front end."  Bahr stated that "OMI has also developed a number of specific database modules for the exclusive use of individual components for specific case tracking and work processing needs."

### C.      Plaintiffs' FOIA Request

In a letter dated June 7, 2004 to James Kovakas, the Attorney-In-Charge of the Freedom of Information and Privacy Acts Office of the Division, plaintiffs requested:

(A)     an electronic copy of those records pertaining to court cases filed or pending in court since October 1, 1999 (FY2000 to date) contained in the CASES database, and

(B)     the following descriptive information about the CASES database:

     (i)      table schema and definitions of all codes used,
     (ii)     records describing the scope of coverage of cases included (and excluded) from CASES,

      (iii)       changes in CASES that have occurred during this period, including changes in case coverage, or in tables, fields, and codes that have occurred and when these changes took place,

      (iv)      current data input and users' manuals, including any directives supplementing (or used in place of) these

      (v)       descriptions of all regularly prepared reports currently using CASES

      (vi)      records describing any validation, error checking or other procedures currently used to ensure data quality

Whenever these records exist in electronic form, we request that they be provided on computer media and that you discuss with us the choice of suitable media and recording formats to be used.

Kovakas stated that he "initially denied Part A of plaintiffs' request pursuant to various FOIA exemptions to disclosure." In her declaration, plaintiff Long stated that defendant produced "a handful of documents including a table listing names and a brief description of 42 fields in CASES" in response to Part B.

Plaintiffs appealed defendant's denial of their request to OIP. On September 5, 2005, OIP remanded plaintiffs' request to Kovakas's office for further processing of the responsive records and disclosure of any non-exempt portions of these records.

According to Kovakas, the Division's FOIA office worked with OMI's technical staff to determine whether it was possible to provide an electronic copy of the CASES database while excluding fields containing exempt information. Kovakas stated that to do this, OMI staff wrote a query to select records from the database within the designated time period and limit the selected records to those pertaining to filed cases.

Kovakas stated that he used a "Data Dictionary", which contained descriptive information about individual databases and fields, to "determine[] what database fields were exempt from release". According to Kovakas, when OMI staff informed him that it was not technically feasible to indicate redactions in the extracted data, he "asked them to design the query to exclude

the fields of data that [he] designated as exempt", including all sealed case records.  Specifically, Kovakas stated, he asked OMI staff to "exclude all qui tam cases and all cases with the word 'sealed' in the caption."

On March 31, 2006, defendant sent plaintiffs a disk with an electronic copy of the CASES database in Microsoft Access.  Defendant withheld from this disclosure certain categories of data pursuant to various FOIA exemptions.  According to Kovakas, the disk also contained a relational diagram indicating how the table data could be linked together using internal file numbers that were included in the release.

According to Long, plaintiffs received: (1) "a limited amount of CASES data"; (2) "the first-version 'Data Dictionary'"; (3) a Case Classification Manual dated June 2001; and (4) "some electronic files related to the released CASES data, including a purported 'schema.'"

In a letter dated May 16, 2006, plaintiffs' attorney notified defendant that the March 2006 release only contained data for closed cases and did not appear to include data for all filed cases during the requested time period.  Plaintiffs also complained, *inter alia*, that there was no indication where the redactions of exempt data occurred in the released tables or how much data was withheld.

Kovakas stated that upon inquiry he learned that "there must have been an inadvertent error in composing the search query, which resulted in the omission of pending cases from the release."  Kovakas asked OMI to produce a second version of the database correcting the error.

On September 8, 2006, plaintiffs filed the instant action.  On November 29, 2006, defendant sent plaintiffs a corrected disk containing CASES data for pending and closed cases, which had been "extracted using the new script" and document entitled "List of OMI Reports".

Defendant subsequently provided a "Quality Assurance Procedures Manual" to plaintiffs.  Long stated in her declaration that although defendant's provision of information purported to include more case entries and data fields than the March 2006 production, it contained fewer cases with fewer data fields.

In January 2007, the Division's FOIA staff again consulted with OMI technical staff.  A new member of the OMI staff, with FOIA response experience, indicated that he knew how to show redactions in the extracted data.  Plaintiffs provided defendant with computer code and documentation to aid in redacting marking.  Defendant then reprocessed its response to Part A of plaintiffs' request for a third time.

In anticipation of the new response, the parties' attorneys engaged in a series of conference calls regarding various technical aspects of the response.  During these calls, plaintiffs clarified their request for "database 'schema'" and indicated that they wanted a record showing the databases structure that was extracted from the database itself as well as particular technical characteristics of the database tables and fields included in the new response.  Plaintiffs provided the Division with computer code and documentation describing the necessary steps to extract the schema from the CASES database.

Based on plaintiffs' clarification, the Division extracted a list of tables in the database.  Along with a letter dated February 12, 2007, defendant sent plaintiffs a disk containing database information drawn from a portion of the CASES database and charts and manuals relating to the database.  This release also included alert updates to the Case Classification Manual, a Database Integrity Manual, and a time entry guide.  Plaintiffs complained to defendant that the manuals included references to appendices that were not produced.

6

According to Kovakas, the process of extracting table structures from the database revealed that the Data Dictionary document the Division had relied on when making exemptions determinations for previous releases was "flawed". Kovakas explained that "[b]ecause there was no descriptive documentation about these newly-discovered fields and tables" OMI staff created a new Data Dictionary. To do this, technical staff manually reviewed the fields and inserted descriptions in the new Data Dictionary.

Defendant produced its new response to Part A of plaintiffs' request in five stages between February 23, 2007 and August 15, 2007. Additionally, on April 11, 2007, defendant sent plaintiffs materials responsive to Part B of their request, including pages and the appendices that plaintiffs complained had been missing from previous manuals. During the production of the staged release of tables, Kovakas determined that the "ZGRANDJURYPARTY" table, while responsive, was exempt in its entirety.

Regarding Part B of plaintiffs' request, defendant released all responsive material it located, except "JCON IDs". Kovakas explained that JCON IDs are "internal employee identification used" which are also used by employees as "login identification codes that allow access to the Division's network." Kovakas stated that after conferring with Division network security staff, he learned that "Division policy prohibited the disclosure of these codes because they are one half of what an individual would need (along with a password) to access the system." Kovakas therefore determined they were exempt from disclosure.

Defendant deemed the following categories of information exempt under FOIA: JCON IDs; grand jury proceedings; sealed cases; internal and client recommendations on litigation activities; attorney assessments of case valuation and other financial aspects (for open cases

only); daily time reporting records of attorneys and paralegals (for open cases only); amounts spent on investigations (for open cases only); attorney notes or comments; names of consulting doctors in vaccine litigation cases; types of vaccines administered and dates of administration, in vaccine litigation cases; addresses and other contact information for pro se litigants, witnesses in vaccine litigation cases, parties to and beneficiaries of structured settlements, and opposing and non-Division counsel; dollar amount recovered from an identified private party; information relating to disbursement of structured settlements; names of parties associated with alternative dispute resolution proceedings or with particular dispositions in a case, captions for unfiled matters, which likely contain names, and names of vaccine litigation witnesses; government-assigned unique identification numbers; information that would identify government employees seeking government representation in their individual capacities; and details of planned absences of attorneys in the Office of Immigration Litigation.[1]

In support of defendant's categorical withholding, Kovakas explained in his supplemental declaration that:

the instant Request for data from the CASES database presents a situation quite different from that involved with the typical record, where it is possible to review the actual contents of the record when making exemption determinations. Here, plaintiffs requested the contents of a database for a time period such that the response involved over 200,000 cases. Each case may include data in any of the 91 tables and approximately 1500 fields that were ultimately identified as part of CASES. I was not able to review each of the up to 300 million data entries individually in order to make an entry-by entry determination of what was exempt. Even if the sheer amount of data did not make that endeavor impossible, individual pieces of data would have no meaning to me without an understanding of the categories (defined by tables and

---

[1] Plaintiffs concede for purposes of this action that the following fields are exempt from disclosure: vaccine witness notes; recommendations; names of consulting doctors; nonemployee party names; and employee planned absence information. Further, since filing its summary judgment motion, defendant has released the following fields listed in the *Vaughn* Index: 170, 174, 172, 176, 213, 214, 290, and 291. Additionally, defendant determined that fields containing the phrase "all parties/issues" in fields 330 and 331 would be released.

fields) in which the data entries occur. In other words, the database itself constitutes a "categorical" structure, and this structure provides the only workable framework for making exemption determinations.

I therefore used a categorical approach to exemption determinations based on the descriptions of tables and fields provided to me by OMI staff, supplemented by information my staff acquired through consultation with OMI staff and individuals at other litigating components within the Civil Division. When I determined that a field was exempt, I generally withheld the data contained in that field for all case records. This decision was based on my conclusion that entries in any particular database field are not reasonably segregable unless there is a code or another database field that can function as a "flag," such that if the value in the latter is X, then the former field may be released. Without such a flag, even a manual review of the data would not necessarily allow information to be segregated. For example, in order to "segregate" dollar amounts that are estimates from dollar amounts that appear on a plaintiff's complaint, it would be necessary not only to manually review each data entry in this field in CASES, but also to compare the data entry in each field with information .in the complaint and/or any amended complaint filed in that case, in order to compare any requests for monetary relief that appear in these complaints with the amounts that appear in the relevant database field. This task would be immensely time-consuming.

## III.    DISCUSSION

### A.    FOIA

 "FOIA was enacted to promote honest and open government and to assure the existence of an informed citizenry to hold the governors accountable to the governed."  *Grand Cent. Partnership, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (internal quotation marks omitted). "FOIA strongly favors a policy of disclosure and requires the government to disclose its records unless its documents fall within one of the specific, enumerated exemptions set forth in the Act." *National Council of La Raza v. Department of Justice*, 411 F.3d 350, 356 (2d Cir. 2005) (citing 5 U.S.C. § 552(a)(3), (b)(1)-(9)).  Courts construe these exemptions narrowly, resolving all doubts "in favor of disclosure".  *Local 3, Int'l Bhd. of Elec. Workers v. NLRB*, 845 F.2d 1177, 1180 (2d Cir.1988).  The government bears the burden of showing "that any claimed exemption applies."

9

*National Council of La Raza*, 411 F.3d at 356.  Courts review the government's decision to withhold or redact information *de novo*.  5 U.S.C. § 552(a)(4)(B).

**B.      Summary Judgment Standard**

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 258 (1986). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute.  *See id*.  The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided.  *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case.  *See id*. at 325.  Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial.  *See* Fed. R. Civ. P. 56(e).  A trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *see Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir. 1985).

The Second Circuit has described the procedure for resolving motions for summary judgment in FOIA cases as follows:

> In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA. Affidavits or declarations supplying facts indicating that the agency has conducted a thorough search and giving

reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden. Affidavits submitted by an agency are accorded a presumption of good faith; accordingly, discovery relating to the agency's search and the exemptions it claims for withholding records generally is unnecessary if the agency's submissions are adequate on their face. When this is the case, the district court may forgo discovery and award summary judgment on the basis of affidavits.

In order to justify discovery once the agency has satisfied its burden, the plaintiff must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, or provide some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate.

*Carney v. United States Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994) (citations, internal footnote, and quotation marks omitted).

## 1.    Adequacy of Search

Plaintiffs assert that defendant's search for materials responsive to their FOIA request was inadequate.  The Second Circuit has stated that:

to establish the adequacy of a search, agency affidavits must be ... relatively detailed and nonconclusory, and ... submitted in good faith.  Moreover, affidavits submitted by an agency are accorded a presumption of good faith.  This presumption cannot be rebutted by purely speculative claims about the existence and discoverability of other documents . . . .  [I]n order to justify discovery once the agency has satisfied its burden, the plaintiff must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations.

*Grand Cent. Partnership, Inc. v. Cuomo*, 166 F.3d 473, 488-89 (2d Cir 1999) (internal quotation marks and citations omitted).  Courts in this Circuit and the D.C. Circuit have "held that affidavits describing a search 'must detail files searched and the general scheme of the agency file system.'" *El Badrawi v. Dep't of Homeland Security*, 583 F.Supp.2d 285, 300 (D.Conn. 2008) (quoting *Fisher v. FBI*, 94 F.Supp.2d 213, 218 n. 2 (D.Conn. 2000), citing *Church of Scientology v. IRS*, 792 F.2d 146, 150 (D.C.Cir. 1986); *Dinsio v. FBI*, 445 F.Supp.2d 305, 312 (W.D.N.Y. 2006); and

*Rabin v. United States Dep't of State, CIA*, 980 F.Supp. 116, 120 (E.D.N.Y. 1997)). "When a plaintiff questions the adequacy of the search an agency made in order to satisfy its FOIA request, the factual question it raises is whether the search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant." *SafeCard Servs., Inc. v. Securities and Exchange Comm.*, 926 F.2d 1197, 1201 (D.C.Cir. 1991).

Plaintiffs assert that defendant's declarations lack the "reasonable detail" required to show that the search for the information described in Part B of plaintiffs' request, which relates to information about the CASES database, was adequate.  Plaintiffs further assert that there are "a number of fields" listed as exempt in the *Vaughn* Index[2] which they cannot contest because defendant released no manuals or other data about them.  These fields are: Structured Settlement Information; Information Identifying Employees Seeking Government Representation; Nonemployee Address and Other Contact Information; Nonemployee Party Names; and Grand Jury Party.  Plaintiffs argue that the absence of manuals or data about this information is evidence that defendant's search for materials in response to Part B of their FOIA request was inadequate.

In addition to declarations by Kovakas and Bahr describing, generally, efforts defendant made to search for responsive information, defendant submitted a declaration by Siobhan Sperin, Director of the Office of Management Information.  Sperin stated that her responsibilities as OMI Director "include overseeing the operation and maintenance of [CASES], and the coordination of case tracking activities performed by contractor staff who support my office."  Sperin explained that OMI has "approximately five full-time employees" "who are primarily involved in the technical and functional aspects of supporting, maintaining and operating the CASES database."

---

[2] *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).

According to Sperin, approximately thirty contractors have on-site offices, and are responsible for, among other things, classifying incoming matters and data entry and verification functions for the core CASES tables and fields.

Sperin explained that OMI paper files are kept in a single file room, and electronic files are kept "in folders on multiple servers".  Sperin stated that after reviewing a list of the records plaintiffs had received in response to their FOIA request and the categories of information plaintiffs requested she determined "the only likely location for any additional records was either in the OMI file room or in the individual files of OMI or contractor staff."  Sperin directed senior staff members and the program manager for the contractor staff "to coordinate a further search for information . . . in the OMI file room and in their electronic and paper files."  According to Sperin, she and two staff members "searched the OMI file room by looking in each binder and each file folder for responsive information" as well as the paper files of former OMI Director, Dorothy Bahr.  Sperin explained that because of nature of the categories plaintiffs sought and the file systems being searched, "search terms such as 'CASES,' 'table,' field,' 'code,' 'data,' 'report,' or 'error' could not be useful to identify responsive records.  Any record that exists in OMI would probably contain one of these words."  Consequently, Sperin explained, staff had to "identify responsive records based on their familiarity with the type of record or its contents, or, if necessary, their review of the record."  According to Sperin, "[a]ll potentially responsive information was sent to . . . . Kovakas".

Additionally, Kovakas stated in his declaration that he requested the directors of the litigating components using the independent CASES modules, ADR, Government Employee Representation, Foreign Litigation, Immigration Calendering, RECA, Structured Settlement, and

Vaccine Litigation, to coordinate a search for any documentation associated with these modules. Kovakas explained that if they existed, these records "would most likely be in current use and thus would be found in the possession of individuals involved with inputting data into these modules rather than in any general file system".  Kovakas contacted each component director, but no responsive records were found.  Kovakas further stated that to his knowledge, "all files and locations likely to contain material responsive to Part B of plaintiffs' request have been searched, and all responsive material has either been identified or is currently in my possession and is being processed."

Plaintiffs assert that the contractors who performed the transfer of the CASES database from a mainframe computer to an SQL server in 1999 might have contracts or materials relevant to their request for records describing changes in CASES.  In response, Kovakas stated that it was unlikely the contractor retained records concerning an operation that occurred over eight years ago, and, in any event, any records in the contractor's possession were not "agency records".  Kovakas also addressed Long's speculative assertions that the Federal Records Center and the Division's procurement office might also have relevant records, and explained that it was unlikely, and that even if they did, it was unlikely any records would contain descriptive information about CASES.

Plaintiffs question the good faith of defendant's submissions based on defendant's alteration of the Data Dictionary's description of certain fields from "notes" to "attorney notes", and "monetary amount sought" to "amount . . . based on attorney's estimate."  Plaintiffs assert that defendant then used the altered descriptions in its *Vaughn* Index to support its decision to withhold information in these fields.  The sole basis for plaintiffs' suggestion of bad faith is the

change defendant made in the Data Dictionary's description of these fields following the

commencement of this lawsuit.  The changes and the reason defendant made the changes,

however, are undisputed.  Regarding changes to the Data Dictionary from which plaintiffs infer

bad faith, Kovakas explained:

> Long asserts that my staff deliberately altered field descriptions as a means of
> frustrating plaintiffs' FOIA Request. This is not true. My office's attempt to respond
> to plaintiffs' Request was impeded by the simple fact that there was no complete and
> accurate documentation available that listed and described all tables and fields in the
> CASES database. When the 1999 data dictionary document was located by OMI on
> one of its servers, we believed that this document accurately represented the CASES
> database, and we therefore used it as the starting point for exemption determinations.
> However, the field descriptions in this document often did not provide an explanation
> of the data that was adequate for purposes of making exemption determinations. My
> staff therefore consulted with OMI staff and with individuals in the various litigating
> components of the Civil Division in order to supplement and clarify the information
> contained in the 1999 data. dictionary document. We did not make any changes to the
> field descriptions in the 1999 document based on this consultation, but the exemption
> determinations made prior to the March 2006 and November 2006 releases reflected
> our understanding of what the fields contained.
>
> In early 2007, OMI discovered that the SQL server that houses the CASES database
> contained tables and fields that were not listed in the 1999 data dictionary document.
> Upon further examination of these tables and fields, it was also discovered that some
> tables and fields that were listed in the 1999 data dictionary were temporary or test
> tables that are not actually part of the active database and do not contain any valid
> information. It was decided that the Division would re-process plaintiffs' Request for
> CASES database data, and that to do so, it would be necessary to create a new data
> dictionary that accurately listed the tables and fields in the CASES database, and that
> included descriptions of all these tables and fields.
>
> A preliminary version of this new Data Dictionary was completed by OMI staff in
> early spring 2007. Because we had agreed with the plaintiffs to release the CASES
> data in stages, the new Data Dictionary document was sub-divided into charts that
> each included the tables to be released at a particular stage. These charts were used
> as working tools on which exemption determinations were made and redaction
> instructions for OMI staff were marked. For a number of stages, these charts were
> also provided to plaintiffs in advance of the release, and plaintiffs asked various
> questions about the fields and the exemption determinations during conference calls
> with the Division's attorney. In response to such questions, or based on our own
> desire to clarify the nature of information in particular fields, my staff again

sometimes sought further information from OMI or other litigating components. In order to represent the content of fields accurately in the new Data Dictionary document based on what we learned, we sometimes modified the field descriptions in that document. My exemption decision for each CASES database field was based on my understanding of the nature of the information contained in that field.

According to Long, defendant only began describing the presence of "attorney notes" in certain fields in the fourth version of the Data Dictionary.  Defendant does not dispute changes in the Data Dictionary, but explains that the changes were made by OMI staff in order to assist the FOIA office in making exemption determinations and to reflect defendant's understanding of what those fields contain.  Thus, plaintiffs have failed to rebut the presumption of good faith to which the declarations are entitled on the issue of the adequacy of the search.  Accordingly, defendant is entitled to summary judgment.

### 2.    Segregability

Plaintiffs argue for denial of defendant's motion for summary judgment on the basis that defendant has failed to comply with its obligation to release "[a]ny reasonably segregable portion of a record . . . after deletion of portions which are exempt."  5 U.S.C. § 552(b).  The Second Circuit has explained that "if the proportion of nonexempt factual material is relatively small and is so interspersed with exempt material that separation by the agency and policing of this by the courts would impose an inordinate burden, the material is still protected because, although not exempt, it is not 'reasonably segregable,' under the final clause of § 552(b)."  *Lead Indus. Ass'n, Inc., v. Occupational Safety and Health Admin. et al.*, 610 F.2d 70, 86 (2d Cir. 1979).  "Before approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld."  *Sussman v. U.S. Marshals Serv*., 494 F.3d 1106, 1116 (D.C.Cir. 2007).  Further, the Second Circuit has instructed that "[a] determination of

16

which if any portions of an otherwise exempt document are nonexempt must begin with a consideration of the nature of the document as a whole." *Lead Indus.*, 610 F.2d at 85.  Generally, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman*, 494 F.3d at 1117.  However, "[i]f the requester successfully rebuts this presumption, the burden lies with the government to demonstrate that no segregable, nonexempt portions were withheld." *Id*.

It is undisputed that defendant made categorical withholdings in certain fields rather than segregating and releasing the nonexempt information.  Defendant claims, however, that the nonexempt portions of the fields at issue are not reasonably segregable because it would be a burden for the Division to segregate the relatively small number of nonexempt entries from the vast number of exempt entries.  The Court will address the issue of segregability as necessary.

### 3.        Exemption 2 - JCON IDs
### *Vaughn* Index 1- 139[3]

Exemption 2 protects from disclosure records "related solely to the internal personnel rules and practices of an agency," 5 U.S.C. § 552(b)(2).  More specifically, it "relates to information concerning those rules and practices that affect the internal workings of an agency, and, therefore, would be of no genuine public interest."  *Massey v. FBI*, 3 F.3d 620, 622 (2d Cir. 1993) (internal quotation marks omitted).  "Such internal agency information may be withheld if it is of 'no genuine public interest' or, if the material is of public interest, and 'the government demonstrates that disclosure of the material would risk circumvention of lawful agency regulations.'" *Id*. (quoting *Buffalo Evening News, Inc. v. United States Border Patrol*, 791

---

[3] The Court denies defendant's motion to strike and, as stated in its text order entered February 2, 2009, accepts defendant's sur-reply.

F.Supp. 386, 391 (W.D.N.Y. 1992)).  "Courts have divided Exemption 2 into two categories.  A 'high 2' exemption involves personnel rules and practices that are of no public interest or that risk of circumvention of the law, while a 'low 2' exemption relates to trivial, agency-internal administrative matters."  *El Badrawi v. Dep't of Homeland Sec.*, 583 F.Supp.2d 285, 312 (D.Conn. 2008) (citing *Founding Church of Scientology, Inc. v. Smith*, 721 F.2d 828, 831 (D.C.Cir. 1983)).

Kovakas states in his declaration that 127 of the fields contained in the CASES database were withheld from disclosure because they contained JCON IDs.  Kovakas explained that JCON IDs are "internal identification codes."  Kovakas stated that he withheld them under the "low 2" exemption because the Division uses codes internally "as a means of identifying employees".  Kovakas further stated that "high 2" exemption was applicable because JCON IDs are used "as login identification codes that allow access to the Division's network" and disclosure would violate defendant's network security policy.  Kovakas averred that Division network security staff informed him that JCON IDs "are one half of what an individual would need (along with a password) to access the system."

In opposition, plaintiffs argue that since the obvious construction of a JCON ID is a user's first initial plus last name and the Division has released attorney names, a JCON ID provides no network security and the Division's purported security concerns are disingenuous.

In response, defendant would neither confirm nor deny plaintiffs' contention regarding the construction of a JCON ID.  Rather, it submitted a declaration by Douglas McManus, Director of the Office of Policy and Management Operations and Chief Information Security Officer in the DOJ Civil Division.  According to McManus, JCON user accounts are used to identify and

authenticate users to the system and are commonly referred to as a JCON "user name", "account name", or "ID".  McManus stated that "[a] JCON ID coupled with a password constitute the credentials necessary to logon to JCON and access protected information available to a specific user."  McManus averred that it is the Division's policy, based on the National Institutes of Standards and Technology guidelines for securing, certifying and accreditation of a government computer system, not to release JCON ID information for any JCON user.  McManus explained that "publishing the user name itself can expose the system to an elevated risk of unauthorized access" because, for instance, a person trying to access the system "could craft a password guessing program to cycle through the list of known user names, trying random or dictionary based attacks on each account in turn at a rate slow enough to evade the system's intrusion detections alerting system."

As stated, the Court must first determine whether the material at issue "relates solely to the agency's *internal* rules and practices."  *Buffalo Evening News, Inc.,* 791 F.Supp. at 391 . "Exemption 2's internality requirement 'plainly limits the exemption to those rules and practices that affect the internal workings of an agency[,]' and, therefore, would be of no genuine public interest."  *Id*. (quoting *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051, 1056 (D.C.Cir.1981) (en banc).   It is undisputed that JCON IDs relate solely to the Division's internal rules and practices regarding use of the JCON system.  Further, there is no public interest in the JCON IDs.  Indeed, plaintiffs seek disclosure of the JCON ID fields solely to determine which attorney is handling each filed case, not because any JCON ID intrinsically discloses anything about the workings of the agency.  Even if there were an identifiable public interest in a user's login information, defendant has established that disclosure of JCON IDs would violate its

network security policies.  Accordingly, the Court finds that defendant adequately satisfied its burden of establishing that JCON IDs are exempt under Exemption 2.

### 4.    Exemption 5

Exemption 5 provides that FOIA does not apply to "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  Exemption 5 protects from disclosure "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental policies are formulated [the 'deliberative process privilege']." *Wood*, 432 F.3d at 83 (internal citation omitted); *see also* 5 U.S.C. § 552(b)(5).  The Second Circuit has explained that "[c]ourts have interpreted Exemption 5 to encompass traditional common-law privileges against disclosure, including the work-product doctrine, and executive, deliberate process and attorney-client privileges."  *National Council of La Raza v. Department of Justice*, 411 F.3d 350, 356 (2d Cir. 2005) (citing *Grand Cent. P'ship, Inc*., 166 F.3d at 481).

> Regarding the attorney work product privilege, the Second Circuit has explained that it:
>
> protects "the files and the mental impressions of an attorney ... reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways" prepared in anticipation of litigation. *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947).  Although factual materials falling within the scope of attorney work product may generally be discovered upon a showing of "substantial need" under Fed.R.Civ.P. 26(b)(3), under exemption 5 the test is whether information "would 'routinely be disclosed' in private litigation."  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 n. 16 (1975) (quoting H.R.Rep. No. 1497, 89th Cong., 2d Sess. 10 (1966)).

*A. Michael's Piano Inc. v. F.T.C.*, 18 F.3d 138, 146 (2d Cir. 1994).  Thus, to justify nondisclosure under this exemption, the Government must show that the material "(1) [is] a document or tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a

party, or by or for his representative." *ECDC Envt'l v. New York Marine & Gen. Ins. Co.*, No. 96 Civ. 6033, 1998 WL 614478, at *11 (S.D.N.Y. June 4, 1998).

The deliberative process privilege is "a sub-species of work-product privilege that covers documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 76 (2d Cir. 2002) (internal quotation marks and citations omitted). "An inter- or intra-agency document may be withheld pursuant to the deliberative process privilege if it is: (1) 'predecisional,' *i.e.*, 'prepared in order to assist an agency decision-maker in arriving at his decision,' and (2) 'deliberative,' i.e., 'actually . . . related to the process by which policies are formulated." *La Raza*, 411 F.3d at 356 (quoting *Grand Cent. P'ship ,Inc.*, 166 F.3d at 482).

If, however, a record "loses its predecisional and deliberative character . . . the deliberative process privilege no longer applies." *Id.*; *see NLRB v. Sears Roebuck & Co.*, 421 U.S. 132, 161 (1975) (a document is no longer entitled to protection under the deliberative process privilege if the agency has chosen expressly "to adopt or incorporate by reference [a] . . . memorandum previously covered by Exemption 5 in what would otherwise be a final opinion.").

### a.   Attorney Assessments of Case Valuations - Open Cases *Vaughn* Index 157-69, 177-84

According to the *Vaughn* Index, these fields contain the following information: "monetary amount sought by opposition, based on attorney's estimate if not specified in pleadings", "monetary amount sought by government, based on attorney's estimate if not specified in pleadings", "government exposure amount, based on attorney estimate," "monetary value for undisposed event awarded to the opposition". Kovakas explained in his declaration that these fields contain information about "how much plaintiffs are seeking in damages, what the

21

government's financial exposure in a case is, how much money a particular disposition in a case cost or saves, how realistic the opposition's demand for damages is, and what percentage of damages is viewed as 'punitive' by the litigating component."  According to Kovakas, these assessments inform the Division's litigating decisions, and are "attorney work product . . . because they reflect the mental impressions of attorneys regarding particular cases."  Kovakas stated that his description of the information is consistent with the 2007 Case Classification Procedures Manual, which provides instructions on the input of information from a complaint into the CASES database.

Plaintiffs point out that the manual directs entry of the dollar amount the plaintiff seeks, as specified in the complaint, and entry of the same data from a Division disposition form.  Plaintiffs therefore argue that the fields at issue contain historical fact and are not attorney work product or subject to the deliberative process privilege.  In response, Kovakas stated that when a complaint does not specify the dollar amount sought the information in the fields at issue are attorney estimates.  Kovakas further stated that there is no way to segregate the fields with information from a complaint from the fields with information based on an attorney's estimate.

Having considered the Division's declarations, the Court finds they lack sufficient detail to justify withholding "attorney assessments of case valuations" records under the work product or deliberative process privilege.  Defendant does not does not explain what disclosure of the information in the "government exposure amount, based on attorney estimate," "monetary value for undisposed event awarded to the opposition" fields would reveal; it states only that they "reflect the mental impressions of attorneys regarding particular cases."  Thus, the Court has no factual basis on which to assess how the amounts are determined, what the amounts are based on,

and how they relate to the litigation process.  *See e.g. Halpern v. F.B.I.*, 181 F.3d 279, 295 (2d Cir. 1999) ("Absent a sufficiently specific explanation from an agency, a court's de novo review is not possible and the adversary process envisioned in FOIA litigation cannot function."). As a further matter, defendant simply states that this field is not segregable but has failed to indicate the proportion of exempt and nonexempt information in any of the declarations on which it relies. Accordingly, summary judgment is inappropriate at this point and defendant's motion is therefore denied without prejudice to renewal following the filing of supplemental declarations regarding Attorney Assessments of Case Valuations.  *See id.* ("the district court will have a number of options for eliciting further detail from the government.  It may require supplemental *Vaughn* affidavits").

> **b.      Portion of Damages Designated as Punitive**
> **_Vaughn_ Index 170-171, 174-175**

Defendant has withheld, pursuant to Exemption 5, fields regarding  "portion of damages designated as punitive by agency" and "portion of damages in . . . Health Care False Claims Act ['HCFCA'] . . . case designated as punitive by agency".  Kovakas explained that the fields regarding portion of damages in HCFCA cases, "relate to amounts entered by the assigned attorney on line 8 of the Civil Fraud Disposition Report, entitled 'Health Care Control Account.'" Kovakas averred that "based on [his] office's consultation with individuals in the Civil Frauds litigating component and OMI . . . . the information in these fields reflects Civil Frauds' discretionary determination of whether to seek single, double, or triple punitive damages in a particular case." Kovakas stated that these fields reflect the percentage of awarded damages the litigating component views as punitive.  Kovakas asserted that disclosure of these records would: chill Division attorneys' candid assessments of Division cases and interfere with the decision

making process;  "allow defendants in other cases to compare the level of punitive damages being sought in their cases with the levels sought in the cases for which this data was revealed"; and "chill Civil Frauds' discretion in adjusting the level of punitive damages sought to individual circumstances on a case-by-case basis."

Plaintiffs contend this data is entered as a dollar amount at the time of disposition or settlement of a suit and is not privileged because it is either the amount of damages designated as punitive by a court in a judgment, or the monetary award resulting from a settlement and therefore representative of a final agency decision.

The Court finds that the declarations on which defendant relies fail to offer any detailed explanation for withholding these records.  Indeed, while Kovakas's declaration indicates that the punitive damages information at issue is entered by the assigned attorney, it does not indicate, with any specificity, what the information is and whether the information was prepared in anticipation of litigation.  Accordingly, summary judgment is inappropriate at this point and defendant's motion is therefore denied without prejudice to renewal following the filing of supplemental declarations regarding "Portion of Damages Designated as Punitive".

### c.      Time Reporting Information
### *Vaughn* Index 193-210

Kovakas withheld the "Time Reporting Information" field which "contains records of time spent by litigation staff each day on particular cases as well as other activities."  Defendant has released this information for "closed cases."  Kovakas stated that:

> The Time Reporting table in the CASES database contains records of time spent by litigation staff each day on particular cases as well as other activities. Litigation staff is responsible for reporting their own time, and it is well known in the Division that attorneys often report only eight hours a day even though they actually are working more than that.  It is also well known that attorneys often do not make

24

contemporaneous records of their time but do so sporadically and therefore their specification of which cases they worked on in a particular day, for how many hours, is not accurate. These time records are therefore only used internally as a starting point for evaluating Division costs and budgetary requirements. At the same time, to the extent these records indicate activity is occurring on a particular case that is still ongoing, they are likely to reveal the Division's legal strategy.

Kovakas cites Exemptions 5 and 2 as the basis for withholding information from these fields.

In this case, plaintiffs seek only data with respect to those stages of cases as to which a disposition has been entered in CASES. Defendant asserts that it has, and will, release information all cases designated as "closed" in the CASES database, but that it will not release the time reporting information at the end of a "stage". Kovakas explained that:

the fact that a disposition has been entered in a case, even if the disposition is designated as final, does not necessarily mean that litigation at that level is over. An opposing party may seek to continue litigation at a particular stage even when a case has supposedly advanced to a different stage by, for example, filing documents in district court even while a case is on appeal. Cases may be remanded from the supreme court or appellate levels to prior levels . . . . Time records from that stage, if subject to release under FOIA, could be used by opposing parties in their determinations of whether to appeal and their assessments of whether the government will appeal. Moreover, indications of time spent in one stage may provide insight into the government's litigation strategy in later stages.

"As a general rule, a client's identity and fee information are not privileged." *Lefcourt v. United States*, 125 F.3d 79, 86 (2d Cir. 1997) (citing *In re Grand Jury Subpoena Served Upon John Doe, Esq.*, 781 F.2d 238, 247 (2d Cir. 1986) (in banc). There is, however, authority for the proposition that such records may be privileged "when they disclose the nature of the services provided, reveal attorneys' advice or reveal details about . . . investigations of . . .claims." *Ehrich v. Binghamton City Sch. Dist.*, 210 F.R.D. 17, 22 (N.D.N.Y. 2002) (citing cases).

In this case, defendant's declarations sufficiently explain why attorney time records constitute privileged information within the meaning of Exemption 5. As the Second Circuit has

stated, the attorney work product privilege protects "the files and the mental impressions of an attorney". *A. Michael's Piano*, 18 F.3d at 146.   Kovakas's declarations show that the time records reflect the intensity of the government attorneys' efforts in handling individual cases. This information would reveal to opposing parties the amount of time the government's attorneys were spending on a particular cases and provide insight into the government's litigation strategy at future stages.   Indeed, plaintiffs do not seriously challenge the privileged nature of these records.   Rather, their principal claim is that they are entitled to this information for those stages of cases as to which a disposition has been entered - not just for closed cases.   However, even if, for example, a disposition has been entered with respect to a motion in a particular case, one party may still appeal the disposition.   Thus, defendant properly withheld attorney time reporting information for cases that are not "closed".   Accordingly, defendant is entitled to summary judgment with respect to "Time Reporting Information". [4]

### d.   Attorney Notes and Costs
### *Vaughn* Index 217, 224

Kovakas stated that he withheld the "Attorney Notes and Costs" fields pursuant to Exemption 5 because they "contained notes either input directly by attorneys or based on contractor interviews with attorneys[,]" "relate to litigation activities and can contain an attorney's thoughts and legal analysis of a case or details that can impact the strategy of a case." Kovakas stated that "[t]here is no restriction on what kind of information might be included as a 'note' or 'comment.'"   The DBI Manual states that "[t]he Notes utility should be used consistently . . . to record instructions or key pieces of information obtained from the attorney, to

---

[4] Defendant argues alternatively that attorney time records may be withheld pursuant to Exemption 2.  It, however, has advanced no meaningful argument in its briefs or declarations in support of this claim.

describe and explain inconsistencies between data elements or to record other information which cannot be entered in the CASES data fields."  Regarding segregability, Kovakas averred that he applied his exemption determination categorically because in order to segregate any attorney notes the Division might be willing to release, manual review of every data entry would be necessary.  Kovakas further averred that plaintiffs received records for more than 200,000 cases, each of which might have a number of note entries in various fields.

Regarding "attorney notes and costs", plaintiffs cite defendant's CASES Q[uality] A[ssurance] Manual to support their assertion that attorneys do not use CASES in their day-to day litigating and therefore defendant's improperly exempted the attorney notes fields as attorney work product or deliberative information.[5]  In response, Kovakas asserts that the manual contains "no restriction on what kind of information might be included as a 'note' or a 'comment.'"

The Court finds defendant's submissions do not provide adequate detail from which to determine whether defendant properly withheld the "attorney notes" category from disclosure pursuant to Exemption 5, or any other exemption.  Indeed, defendant offers no specific description of what an attorney note might contain, what kind of "inconsistencies between data elements" might need to be explained in such a note, or any examples of what "other information which cannot be entered in the CASES data fields" might consist.  The absence of such detail prevents plaintiffs from challenging defendant's decision to withhold the attorney notes category and prohibits any analysis of its decision by the Court.  Nor has defendant submitted evidence regarding the segregability of this field.  Accordingly, summary judgment is inappropriate at this

---

[5] To the extent plaintiffs argue that the changes defendant made to its Data Dictionary in the area of 'attorney notes" is evidence of bad faith, the Court previously found no merit to this argument.

27

point and defendant's motion is therefore denied without prejudice to renewal following the filing of supplemental declarations regarding "Attorney Notes and Costs".

### 5.    Exemption 6

FOIA Exemption 6 protects against disclosure that implicates personal privacy interests. The government may withhold records in "personnel and medical files and similar files" only when their release "would constitute a *clearly unwarranted* invasion of personal privacy."  5 U.S.C. § 552(b)(6) (2006) (emphasis added).  "Exemption 6 is intended to 'protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information.'"  *Wood v. FBI*, 432 F.3d 78, 86 (2d Cir. 2005) (quoting *United States Dep't of State v. Washington Post Co.*, 456 U.S. 595, 599 (1982)).  To determine whether names and other records at issue may be withheld under Exemption 6, the Court must: (1) "determine whether the personal information is contained in a file similar to a medical or personnel file", that is "whether the records at issue are likely to contain the type of personal information that would be in a medical or personnel file"; and (2) "balance the public's need for the information against the individual's privacy interest to determine whether the disclosure of the names would constitute a 'clearly unwarranted invasion of personal privacy.'"  *Id*. (quoting 5 U.S.C. § 552(b)(6)).

#### a.    Vaccine Type and Date of Administration
#### *Vaughn* Index 239-40

Kovakas declared that under Exemption 6, he withheld the "date vaccine administered" and vaccine type to protect the privacy of the individuals who had received the vaccines. Kovakas explained that "[t]he names of the individuals who filed suit in the relevant vaccine litigation were already released in the form of case captions.  The individuals so identified are either the individual who received the vaccine or someone acting on that person's behalf, so

disclosing the details of the vaccine that was administered would provide specific medical

information about named individuals."  Defendant principally relies on 42 U.S.C. § 300aa-25 of

the Vaccine Act in support of its decision to withhold vaccine information.  Plaintiffs argue that

defendant misapprehends the Vaccine Act's disclosure instructions and assert that it allows

disclosure of this information.

Section 300aa-25 provides:

(a) General rule
Each health care provider who administers a vaccine set forth in the Vaccine Injury
Table to any person shall record, or ensure that there is recorded, in such person's
permanent medical record (or in a permanent office log or file to which a legal
representative shall have access upon request) with respect to each such vaccine--
(1) the date of administration of the vaccine,
(2) the vaccine manufacturer and lot number of the vaccine,
(3) the name and address and, if appropriate, the title of the health care provider
administering the vaccine, and
(4) any other identifying information on the vaccine required pursuant to regulations
promulgated by the Secretary.
(b) Reporting
(1) Each health care provider and vaccine manufacturer shall report to the Secretary--
(A) the occurrence of any event set forth in the Vaccine Injury Table, including the
events set forth in section 300aa-14(b) of this title which occur within 7 days of the
administration of any vaccine set forth in the Table or within such longer period as
is specified in the Table or section,
(B) the occurrence of any contraindicating reaction to a vaccine which is specified in
the manufacturer's package insert, and
(C) such other matters as the Secretary may by regulation require.
Reports of the matters referred to in subparagraphs (A) and (B) shall be made
beginning 90 days after December 22, 1987. The Secretary shall publish in the
Federal Register as soon as practicable after such date a notice of the reporting
requirement.
(2) A report under paragraph (1) respecting a vaccine shall include the time periods
after the administration of such vaccine within which vaccine-related illnesses,
disabilities, injuries, or conditions, the symptoms and manifestations of such illnesses,
disabilities, injuries, or conditions, or deaths occur, and the manufacturer and lot
number of the vaccine.
(3) The Secretary shall issue the regulations referred to in paragraph (1)(C) within 180
days of December 22, 1987.
(c) *Release of information*

(1) Information which is in the possession of the Federal Government and State and local governments under this section and which may identify an individual shall not be made available under section 552 of Title 5 [FOIA], or otherwise, to any person except--

(A) the person who received the vaccine, or

(B) the legal representative of such person.

(2) For purposes of paragraph (1), the term "information which may identify an individual" shall be limited to the name, street address, and telephone number of the person who received the vaccine and of that person's legal representative and the medical records of such person relating to the administration of the vaccine, and **shall not include** the locality and State of vaccine administration, the name of the health care provider who administered the vaccine, **the date of the vaccination**, or information concerning any reported illness, disability, injury, or condition resulting from the administration of the vaccine, any symptom or manifestation of such illness, disability, injury, or condition, or death resulting from the administration of the vaccine.

(3) **Except as provided in paragraph (1), all information reported under this section shall be available to the public**.

42 U.S.C. § 300aa-25.  The plain language of the statute specifies that the "date of the vaccination . . . shall be available to the public."  Therefore, defendant has no basis on which to withhold the date of vaccination field in this case.  Moreover, the statute prohibits disclosure of "information which may identify an individual", a term the statute expressly limits to the "name, street address, and telephone number of the person who received the vaccine and of that person's legal representative and the medical records of such person relating to the administration of the vaccine".  Indeed, paragraph (3) states that except for this information, "all information reported under this section shall be made available to the public." The statute does not deem the type of vaccine as information which may identify an individual.  Accordingly, the Court finds no basis for defendant's decision to withhold vaccine date and type from disclosure under Exemption 6.

**b.     Structured Settlement Information**
***Vaughn* Index 294-324**

30

According to the *Vaughn* Index, the structured settlement information field descriptions reflect, *inter alia,* "how many annuity payments have been made to beneficiary", "receipt date", "check date", "money amount received", "reversionary trust amount", "beneficiary name", "title for trust", and "sum of the settlement award amounts".  Kovakas explained that he withheld this information pursuant to Exemptions 2 and 6 because the "records are primarily internal and of no interest or value to the public, and . . . to protect the personal privacy of individuals receiving structured settlement benefits."  According to Kovakas, "[t]hese fields give specific information about amounts that an individual receives and how often and on what dates they are received, as well as identifying beneficiaries of specific trusts."

Plaintiffs contest the withholding of this information on the ground that defendant did not provide enough information to establish that the information fell under Exemption 2 or 6.  The Court agrees.  Defendant's declarations contain no details; they do not explain how or why these records are internal, nor do they explain the kind of cases to which the records are connected.  Thus, defendant's declarations do not justify withholding these records pursuant Exemption 2 or 6.  Accordingly, summary judgment is inappropriate at this point and defendant's motion is therefore denied without prejudice to renewal following the filing of supplemental declarations regarding "Structured Settlement Information".

### c.    Alien Registration Numbers
*Vaughn* Index 336-337

Kovakas stated that he withheld alien registration numbers on personal privacy grounds because they could be used for identity theft.  Kovakas explained that these are "government-assigned unique identification numbers for non-citizens who have entered the United States."  Plaintiffs argue that alien registration numbers are used by the Board of Immigration Appeals to

track appeals and that all Courts of Appeals that handle appeals from the BIA include these registration numbers on their docket sheets and publicly available decisions.  Even assuming plaintiffs are correct, there is no evidence that the alien registration numbers at issue in this case have been disclosed in such a manner.  On the other hand, however, defendant offers no detailed information regarding how an alien registration number is obtained, how it is used, or how disclosure could lead to identity theft or implicate privacy interests.  Thus, more detailed information is required to determine whether defendant properly withheld alien registration numbers pursuant to Exemption 6.  Accordingly, summary judgment is inappropriate at this point and defendant's motion is therefore denied without prejudice to renewal following the filing of supplemental declarations regarding "Alien Registration Numbers".

### d.    Other Identification Numbers

Kovakas stated that he withheld non-employee identification numbers "assigned by the government to identify private individuals" pursuant to Exemption 6.  According to Kovakas, these numbers "may" include "an individual's tax identification number, alien registration number, military identification number, or loan number."  Kovakas stated that these numbers "can be used for purposes of identity theft to obtain benefits in someone else's name, get information about that person, such as tax, immigration, military, or bank records, or otherwise misappropriate their identity."  Alternatively, Kovakas asserted that these numbers are exempt under Exemption 2 because the Division uses them for internal purposes and they reveal nothing about how the government operates.  Further, Kovakas deemed these numbers not reasonably segregable because, he explained, each case file would need to be investigated to determine whether the number was subject to a FOIA exemption - an "overly burdensome" process.

Plaintiffs contend they are entitled to release of data in this field because the majority of the 25,561 records in this field contain case numbers.  Plaintiffs assert that three are taxpayer ID numbers, three are alien registration numbers, four are military ID numbers, and seven hundred thirty are loan numbers.  Further, plaintiffs assert that defendant failed to specify the privacy interest attached to the remaining numbers, and point out that defendant has only asserted that the above-described numbers "may" appear in the withheld fields.  Again, the Court agrees.  Defendant has not indicated the proportion of exempt to nonexempt numbers.  Thus, there is no basis on which to conclude that the above numbers are not reasonably segregable.  Moreover, the declarations on which defendant rely state only that these fields "may" contain numbers which implicate privacy interests or that are used internally.  Thus, defendant has failed to meet its burden of showing it properly withheld "other ID" information pursuant to Exemption 2 or 6, and that the nonexempt numbers in these fields are not reasonably segregable.  Accordingly, summary judgment is inappropriate at this point and defendant's motion is therefore denied without prejudice to renewal following the filing of supplemental declarations regarding "other ID" fields.

### e.  Nonemployee Address and Other Contact Information  *Vaughn* Index 243-287 and Nonemployee Party Names  *Vaughn* Index 328-329

Kovakas stated that he withheld "address and other contact information that occurs in CASES for certain categories of non-employees - specifically, parties to structured settlements, opposing counsel (including *pro se* litigants), and non-Civil Division counsel (which may include counsel for non-federal co-defendants, and also includes pro se litigants)."  Kovakas released street and mailing address information for attorneys, but withheld phone numbers, fax numbers,

and e-mail addresses because this information could be used "for commercial or other solicitation purposes."

> According to Kovakas:
>
> the names of opposing parties in fields that identify them with a specific disposition in a case or as engaging in ADR reveals information about the individual that may not otherwise be public, which invades the individual's privacy.  For example, one party in a case may have a privacy interest in the fact that he engaged in ADR without the knowledge of his co-plaintiffs.  A particular disposition may bring a financial award . . . or . . . a stigma to a particular party.

Regarding "Nonemployee Party Names" fields, plaintiffs assert that defendant's characterization of their contents is inaccurate.  The *Vaughn* Index indicates that these fields contain the "name of the party to which this disposition relates".  Plaintiffs contend these fields are used in cases with multiple dispositions, that involve multiple parties, or multiple issues.  In response, defendant states that FOIA office staff informed Kovakas that this field may theoretically record descriptions of issues disposed of separately and there is no flag to indicate with these fields contain party names or issue descriptions.  Plaintiffs assert in opposition that the declarations defendant submitted are inadequate to enable them to contest defendant's decision to withhold information in these fields.

As an initial matter, the Division's decision to release attorney names and addresses seems to undermine its assertion that it withheld phone and fax numbers and email addresses because of concerns about unwanted solicitation and privacy.  Further, these attorneys have chosen to appear in these cases.  With regard to the other individuals who may appear in these fields, defendant failed to submit any detailed explanation about who they are, whether they are the plaintiffs or defendants, and whether the matters to which they are connected are filed or unfiled cases.  Nor has defendant provided sufficient information to establish that there is no reasonably segregable

34

information in these fields.  Accordingly, summary judgment is inappropriate at this point and defendant's motion is therefore denied without prejudice to renewal following the filing of supplemental declarations regarding "Nonemployee Address and Other Contact Information" and "Nonemployee Party Names".

### 6.   Redactions - Sealed Cases

Plaintiffs contend that defendant must show redactions for sealed cases.  Morgan Arvaneh, Chief of the Application Software and Engineering Branch of OMI , stated in his supplemental declaration that he was responsible for "advising the FOIA office and litigating attorneys about the technical feasibility of the plaintiff[s'] requests, and . . . creating and running the computer code scripts that produced the data extractions given to the plaintiffs."  Arvaneh stated that the Division's FOIA office asked him "whether it would be possible to redact data for sealed cases so that the fields would show redactions along the horizontal axis of each table that was being released, in the order where the data for that case would otherwise appear."  Arvaneh averred that he responded that "this could cause significant problems in running the SQL script to extract the data for the FOIA releases" and therefore decided that it "would not be possible."  Arvaneh explained that "[t]here is no way in the CASES database to identify" sealed cases and that there were over 1,000 sealed cases during the time period at issue in plaintiffs' FOIA request.  As a result, Arvaneh stated, "for the SQL script to make a redaction marking in every field where there is data . . . it would be necessary to have an instruction that listed every single one of these over-1000 matter numbers, in one SQL line."  According to Arvaneh, "the time that it would take the system to check every matter number for every field would exceed the time that system allows for performing an operation, and the SQL query would fail to produce a result."  Arvaneh further

explained that the "only alternative method would be to make redactions using a 'join' with the table that we created that listed all sealed cases."  According to Arvaneh, this method "would also cause system run-time problems."

In opposition, plaintiffs submitted a declaration by Michael F. Hasan, TRAC's Web Technical Professional.  Hasan stated he based his declaration on personal knowledge, experience working with relational databases and SQL, review of the CASES data released by the Division, and review "of much of the actual SQL code used by Defendant".  Hasan stated that he is familiar with SQL, "including designing and implementing high performance database schemata and optimizing the performance of software programs that use relational database systems to store data."  Hasan stated that Arvaneh is incorrect and that "it is entirely technically feasible to add redaction markings for data related to sealed cases" by structuring the "query in a different way" that would not cause a system run-time problem.  Hasan explained that defendant "has already structured a query which removed all sealed cases data from the CASES data released to plaintiffs" and there "is no inherent difference" between the SQL code to apply redaction markings to sealed cases, and the SQL code defendant used "to identify and delete those records in the first place".

Pursuant to 5 U.S.C. § 552(b), "[t]he amount of information deleted shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by the exemption . . . under which the deletion is made.  If *technically feasible*, the amount of information deleted shall be indicated at the place in the record where such deletion is made." (Emphasis added).

36

In this case, defendant has shown that it is not technically feasible to indicate redactions for sealed cases in the released portions of CASES.  Arvaneh's declarations are specific, and explain in detail that defendant cannot indicate redactions for sealed cases because the method required to do so would cause "system run-time problems".  As stated *supra*, "[a]ffidavits submitted by an agency are accorded a presumption of good faith" if the "facts indicating that the agency has conducted a thorough search and giv[e] reasonably detailed explanations why any withheld documents fall within an exemption".  *Carney*, 19 F.3d at 812.  "[O]nce the agency has satisfied its burden, the plaintiff must make a showing of bad faith . . . or provide some tangible evidence" to establish that summary judgment is inappropriate.  *Id.*

In this case, although Hasan's declaration contains great detail and suggests other methods for redaction marking, in the absence of any indication that he has personal knowledge of the operation of the CASES database, his declaration is insufficient to overcome the presumption of good faith this Court accords Arvaneh's declarations on the issue of redactions.  Arvaneh's declarations are specific and explain that it is not technically feasible to mark redactions for sealed cases because such an undertaking would cause system run-time problems and the SQL query would not produce a result.  Accordingly, summary judgment for defendant is appropriate on the issue of redactions.

## IV.   CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that defendant's motion for summary judgment is **GRANTED** to the extent defendant seeks dismissal of plaintiffs' FOIA claims in connection with the adequacy of defendant's search, defendant's decision to withhold JCON IDs as exempt, defendant's decision

37

to withhold Attorney Time Reporting information as exempt, and defendant's failure to indicate the redaction of sealed cases; and it is further

**ORDERED** that plaintiff's cross-motion for summary judgment regarding defendant's decision to withhold fields related to vaccine type and date of administration is **GRANTED** and defendant is directed to release those fields; and it is further

**ORDERED** that defendant's motion for summary judgment is otherwise **DENIED without prejudice**; and it is further

**ORDERED** that plaintiffs' motion for summary judgment is otherwise **DENIED without prejudice**; and it is further

**ORDERED** that United States Magistrate Judge George H. Lowe is directed to hold a conference to establish a scheduling order for the submission of the supplemental *Vaughn* declarations and additional briefs, and/or new motions for summary judgment.

**IT IS SO ORDERED.**

Date:   March 25, 2010

Norman A. Mordue
Chief United States District Court Judge