**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SUSAN B. LONG and DAVID BURNHAM,**

                **Plaintiffs,**

**v.**

**UNITED STATES DEPARTMENT OF JUSTICE,**

                **Defendant.**
_____

**5:06-CV-1086**
**(NAM/TWD)**

| APPEARANCES: | OF COUNSEL: |
|---|---|
| Ropes & Gray LLP<br>1211 Avenue of the Americas<br>New York, New York 10036-8704<br>*Attorneys for Plaintiffs* | William I. Sussman, Esq.<br>Tal Kedem, Esq. |
| U.S. Department of Justice<br>Civil Division<br>20 Massachusetts Avenue NW<br>P.O. Box 883 Ben Franklin Station<br>Washington, DC 20044 | Kathryn L. Wyer, Esq. |
| Richard Hartunian<br>United States Attorney<br>100 South Clinton Street<br>Syracuse, New York 13261-7198<br>*Attorney for Defendant* | |

**Hon. Norman A. Mordue, United States District Judge:**

**MEMORANDUM DECISION AND ORDER**

## I.   INTRODUCTION

Plaintiffs Susan B. Long and David Burnham brought this action pursuant to the Freedom

of Information Act ("FOIA"), 5 U.S.C. § 552, to challenge the response by defendant, the United

States Department of Justice ("DOJ"), to their FOIA requests for records from or relating to the

DOJ Civil Division's ("the Division") case management system database ("CASES"). Specifically, plaintiffs challenge the DOJ's decision to withhold from disclosure a number of categories under various FOIA exemptions.

## II.   BACKGROUND

### A.   Procedural History

Both parties previously moved for summary judgment.  In a Memorandum Decision and Order entered on March 25, 2010, Dkt. No. 43, the Court granted summary judgment for defendant in connection with the adequacy of the DOJ's search, the DOJ's decision to withhold JCON IDs[1] as exempt, the DOJ's decision to withhold Attorney Time Reporting information as exempt, and the DOJ's failure to indicate the redaction of sealed cases.  The Court granted plaintiffs' cross-motion for summary judgment with respect to the fields related to "vaccine type" and "date of administration" and directed the DOJ to release those fields.  The Court otherwise denied the parties' motions and directed further briefing and supplemental evidentiary submissions on the remaining issues.  The DOJ filed a motion for reconsideration regarding "vaccine type" and "date of administration".  The Court granted the DOJ's motion and vacated its prior decision and entered judgment for defendant on the vaccine issues.  Dkt. No. 60.

On March 7, 2011, the United States Supreme Court decided *Milner v. Dep't of the Navy*, - - U.S. - -, 131 S.Ct. 1259 (2011) and held that FOIA Exemption 2, "which protects from disclosure material that is 'related solely to the internal personnel rules and practice of an agency'" and "encompasses only records relating to issues of employee relations and human

---

[1]JCON IDs are internal identification codes that the DOJ uses as a means of identifying employees.  JCON IDs are used as login identification codes that allow access to the DOJ's network.

resources." *Id*. at 1262, 1271.  *Milner* thus abrogated *Massey v. FBI*, 3 F.3d 620 (2d Cir. 1993), which indicated a broader construction of Exemption 2.  *See id.* at 622 (explaining that "Exemption(b)(2) relates to information concerning those rules and practices that affect the internal workings of an agency[,] and, therefore, would be of no genuine public interest.") (internal quotation marks omitted).  Because aspects of the parties' renewed motion and cross-motion for summary judgment, which were filed prior to *Milner*, centered on Exemption 2, the Court directed the parties to withdraw their motion papers, update them in light of *Milner*, and re-file them.  After withdrawing their motion papers, the parties helpfully narrowed the remaining issues and re-filed their summary judgment motions, which are presently before the Court. Additionally, based on *Milner*, plaintiffs move for reconsideration of the portion the prior decision in which the Court found the DOJ properly withheld JCON IDs pursuant to Exemption 2.  *See* Dkt. No. 61.

### B.    Factual Background

Familiarity with the factual background in this case is assumed.  The Background section in the prior Memorandum Decision and Order summarizes the parties' submissions on summary judgment regarding: the Transactional Records Access Clearinghouse ("TRAC"), a data gathering, data-research and data-distribution organization plaintiffs founded at Syracuse University; CASES, the "current computerized case information system used for tracking basic data on filed civil cases as well as unfiled matters handled in the various litigating components (Branches and Sections) of the Civil Division" of the Department of Justice; the contents of plaintiffs' FOIA request; and the parties' exchange of information in connection with the DOJ's

attempt to fulfill plaintiffs' FOIA request.  *See Memorandum Decision and Order*, Dkt. No. 43, pp. 2-8 (Mar. 25, 2010).

## III.    MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT

In support of its motion for summary judgment, the DOJ submitted declarations, with exhibits, by James Kovakas, the Attorney-In-Charge of the Freedom of Information and Privacy Acts Office of the Division as well as an updated *Vaughn* Index.[2]  In opposition to the DOJ's motion, and in support of their cross-motion, plaintiffs have submitted declarations, with exhibits, by: plaintiff Susan Long, a statistician and an Associate Professor at the Martin J. Whitman School of Management at Syracuse University where she teaches research methods and statistics; and Paul Lang, Managing Clerk in the New York office of Ropes & Gray LLP, plaintiffs' counsel.

### A.    FOIA

"The Freedom of Information Act requires federal agencies to make records and documents publicly available upon request, unless they fall within one of several statutory exemptions."  *Fed. Communc'ns Comm., v. AT&T*, - -U.S. -- , 131 S.Ct. 1177, 1180 (2011).  "FOIA was enacted to promote honest and open government and to assure the existence of an informed citizenry to hold the governors accountable to the governed."  *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (internal quotation marks omitted).  "FOIA strongly favors a policy of disclosure and requires the government to disclose its records unless its documents fall within one of the specific, enumerated exemptions set forth in the Act."  *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005) (citing 5 U.S.C. §

---

[2]*Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir. 1973)

552(a)(3), (b)(1)-(9)).  Courts construe these exemptions narrowly, resolving all doubts "in favor of disclosure".  *Local 3, Int'l Bhd. of Elec. Workers v. NLRB*, 845 F.2d 1177, 1180 (2d Cir.1988). The government bears the burden of showing "that any claimed exemption applies." *Nat'l Council of La Raza*, 411 F.3d at 356.  Courts review the government's decision to withhold or redact information *de novo*.  5 U.S.C. § 552(a)(4)(B).

### B.    Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 258 (1986). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute.  *See id*.  The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided.  *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case.  *See id*. at 325.  Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial.  *See* Fed. R. Civ. P. 56(e).  A trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *see Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir. 1985).

The Second Circuit has described the procedure for resolving motions for summary judgment in FOIA cases as follows:

> In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA. Affidavits or declarations supplying facts indicating that the agency has conducted a thorough search and giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden. Affidavits submitted by an agency are accorded a presumption of good faith; accordingly, discovery relating to the agency's search and the exemptions it claims for withholding records generally is unnecessary if the agency's submissions are adequate on their face. When this is the case, the district court may forgo discovery and award summary judgment on the basis of affidavits.
>
> In order to justify discovery once the agency has satisfied its burden, the plaintiff must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, or provide some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate.

*Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994) (citations, internal footnote, and quotation marks omitted).

## C.    Sealed Cases

Plaintiffs contend that the DOJ wrongfully withheld six CASES fields containing data about sealed cases: zcourt (DD 108); zjudicial_dist (DD 112); zdocket_number_alpha (DD 117); zfile_date (DD 109); zstart_date (DD 132); and zdisposition_date (DD124).  These fields identify the court (*i.e.*, state, federal, appellate), judicial district, docket number, file date, start date, and disposition date of the DOJ's sealed cases.

The DOJ withheld this information on two grounds.  First, Kovakas asserts that the information does not fall within the meaning of "agency records" subject to disclosure under FOIA because it is under court seal and therefore not within the DOJ's discretion to release.

Second, Kovakas asserts that since the "vast majority" of its sealed cases are *qui tam* actions,

filed under the False Claims Act ("FCA"), 31 U.S.C. § 3730, the DOJ properly withheld the fields

under Exemption 3.  *See Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 71 (2d Cir. 2009) ("FOIA

Exemption 3 applies to records 'specifically exempted from disclosure by statute,' provided that

the statute 'requires that the matters be withheld from the public in such a manner as to leave no

discretion on the issue.'") (quoting 5 U.S.C. § 552(b)(3)).

### 1.   Agency Records

FOIA "confers jurisdiction in the district courts when 'agency records' have been

'improperly withheld'".  *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 140 (1989) (quoting

5 U.S.C. § 552(a)(4)(B)).  "Materials are agency records under FOIA if: (1) the agency created or

obtained the relevant records, and (2) the agency is in control of the documents at the time of the

FOIA request."  *Fox News Network, LLC v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d

158, 160 (2d Cir. 2010) (citing *Tax Analysts*, 492 U.S. at 144-45).  "The burden is on the agency

to demonstrate, not the requester to disprove, that the materials sought are not 'agency records' . .

. ." *Tax Analysts*, 494 U.S. at 142 n.3.

Citing *GTE Sylvania, Inc. v. Consumers Union of the U.S., Inc*., 445 U.S. 375 (1980),[3] the

DOJ argues that "[b]ecause a court seal [that seals the case in its entirety] takes all records

concerning a case out of the agency's control - and thus beyond the scope of agency 'records'

subject to FOIA - the Division does not have discretion to release information about cases sealed

---

[3]In *GTE Sylvania*, 445 U.S. at 377, the records at issue were accident reports that the Consumer Product Safety Commission ("CPSC") had received from manufacturers during the course of its investigation into the hazards of the operation of television receivers. The requesters sought disclosure of the accident reports under FOIA. *Id*. "[T]he CPSC informed the requesters and the manufacturers that the documents sought did not fall within any of the exemptions of [FOIA], and that even if disclosure was not mandated . . . [it] would exercise its discretion to release the material". *Id*. The manufacturers filed individual actions in several district courts seeking to enjoin CPSC's disclosure of the allegedly confidential reports. *Id*. at 377-78. These actions were consolidated in the District of Delaware and the district court issued a preliminary injunction enjoining the CPSC from disclosing the reports. *Id*. at 378. The FOIA requesters filed a separate action seeking disclosure of the accident reports under FOIA. *Id*. The CPSC, which was otherwise willing to disclose the reports, contended that the injunction prevented it from releasing them. *Id*. at 379. The Supreme Court found that "[a]t all times since the filing of the complaint in the instant action the agency has been subject to a temporary restraining order or . . . injunction barring disclosure." *Id*. at 386. The Supreme Court concluded that the information was not being "improperly" withheld, explaining that because the agency had "no discretion . . . to exercise" it was not "the CPSC's decision to withhold the documents at all." *Id*. The Supreme Court found this conclusion further supported "by the established doctrine that persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order." *Id*. The Supreme Court explained:

> There is nothing in the legislative history to suggest that in adopting the Freedom of Information Act to curb agency discretion to conceal information, Congress intended to require an agency to commit contempt of court in order to release documents. Indeed, Congress viewed the federal courts as the necessary protectors of the public's right to know. To construe the lawful obedience of an injunction issued by a federal district court with jurisdiction to enter such a decree as "improperly" withholding documents under the Freedom of Information Act would do violence to the common understanding of the term "improperly" and would extend the Act well beyond the intent of Congress.

*Id*. at 387.

in their entirety unless the seal has in fact been lifted."  Defendant's Mem. of Law, 10, Dkt. No. 71-2.

Whether a sealing order removes information from FOIA's purview, however, depends on the reason the order was issued.  *See, e.g., Morgan v. U.S. Dep't of Justice*, 923 F.2d 195, 197 (D.C. Cir. 1991) (holding that if the reason for the seal was "only to prohibit the public from viewing the notes in the public court record; it may not have been intended to affect any future decision by the DOJ to release the notes . . . pursuant to a FOIA request."); *Concepcion v. Federal Bureau of Investigation et al.*, 699 F.Supp 2d 106, 111 (D. D.C. 2010).  The Second Circuit has "ma[d]e clear . . . that a federal court's power to seal documents takes precedence over FOIA rules that would otherwise allow those documents to be disclosed."  *City of Hartford v. Chase*, 942 F.2d 130, 135 (2d Cir. 1991); *see also Fed. Deposit Ins. Corp. v. Ernst & Ernst*, 677 F.2d 230, 232 (2d Cir. 1982) ("It is beyond question that a court may issue orders prohibiting disclosure of documents or information . . . .  Nothing in the legislative history of the FOIA suggests that Congress intended the FOIA to apply to courts or to confidentiality orders issued in an action in which a federal agency is a party.").

With respect to sealing orders in the FOIA context, the District of Columbia Circuit has explained:

> the mere existence of a court seal is, without more, insufficient to justify nondisclosure under the FOIA. Instead, only those sealing orders intended to operate as the functional equivalent of an injunction prohibiting disclosure can justify an agency's decision to withhold records that do not fall within one of the specific FOIA exemptions.

*Morgan*, 923 F.2d at 199.  In *Morgan*, the court held that the agency could sustain its "burden of showing that the court issued the seal with the intent to prohibit the [agency] from disclosing the [document]" by:

> referring to, *inter alia*: (1) the sealing order itself; (2) extrinsic evidence, such as transcripts and papers filed with the sealing court, casting light on the factors that motivated the court to impose the seal; (3) sealing orders of the same court in similar cases that explain the purpose for the imposition of the seals; or (4) the court's general rules or procedures governing the imposition of seals.

*Id.* (footnote omitted).

In this case, the DOJ has submitted nothing that would illuminate the reasons for the issuance of the sealing orders.  Thus, Kovakas's assertion that "the court intended the existence of the case to remain sealed", 7th Kovakas Decl. ¶¶ 7-12, is insufficient to sustain the agency's burden of justifying nondisclosure under FOIA.  Construing it in a light most favorable to the DOJ, however, it does raise an issue of fact as to whether these records are subject to Court seal or, as plaintiffs contend, based on their research of publicly available court databases, *i.e.,* PACER, publicly available and not subject to any court seal.  Thus, there is a question of material fact regarding the scope of the sealing orders and summary judgment is inappropriate.

### 2. *Qui tam* **Cases**

The DOJ argues that even assuming the information plaintiffs seek regarding *qui tam* cases[4] is subject to FOIA, Exemption 3 justifies its decision to withhold that information.

---

[4]The False Claims Act "establishes a scheme that permits either the Attorney General, § 3730(a), or a private party, § 3730(b) to initiate a civil action alleging fraud on the Government." *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 129 S.Ct. 2230, 2234 (2009). 'A private enforcement action under the FCA is called a *qui tam* action". *Id.*

Exemption 3, at the time the DOJ processed plaintiffs' request,[5] stated:

> This section does not apply to matters that are . . . (3) specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld[.]

5 U.S.C. § 552(b)(3).  "FOIA Exemption 3 applies to records 'specifically exempted from disclosure by statute,' provided that the statute 'requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue.'"  *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 71 (2d Cir. 2009) (quoting 5 U.S.C. § 552(b)(3)).

In *CIA v. Sims*, 471 U.S. 159 (1985), the Supreme Court adopted a two-pronged approach to evaluating an agency's invocation of FOIA Exemption 3: First, the court must consider whether the statute identified by the agency is a statute of exemption as contemplated by Exemption 3.  *Id.* at 167.  Second, the court must consider whether the withheld material satisfies the criteria of the exemption statute.  *Id.*; *see Fitzgibbon v. CIA*, 911 F.2d 755, 761 (D.C.Cir.1990).  The D.C.

---

[5]As amended, Exemption 3 states:

This section does not apply to matters that are . . . (3) specifically exempted from disclosure by statute (other than section 552b of this title), if that statute--

(A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

(ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

(B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

5 U.S.C. § 552(b)(3).

Circuit has observed that "Exemption 3 presents considerations distinct and apart from the other eight exemptions" inscribed in FOIA. *Ass'n of Retired R.R. Workers v. U.S. R.R. Ret. Bd.*, 830 F.2d 331, 336 (D.C.Cir. 1987).

In order to provide the government time to investigate and determine whether to intervene, *qui tam* complaints alleging violations of the False Claims Act must be filed *in camera* and under seal. *See* 31 U.S.C. § 3730(b)(2) ("[t]he complaint shall be filed *in camera*, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders."); *see also* S. Rep. 99-345, * 24, 1986 U.S.C.C.A.N. 5266, 5289 ("Keeping the *qui tam* complaint under seal for the initial 60-day time period is intended to allow the Government an adequate opportunity to fully evaluate the private enforcement suit and determine both if that suit involves matters the Government is already investigating and whether it is in the Government's interest to intervene and take over the civil action. Nothing in the statute, however, precludes the Government from intervening before the 60-day period expires, at which time the court would unseal the complaint and have it served upon the defendant . . . .").

The DOJ presents no legal authority for its assertion that 31 U.S.C. § 3730(b)(2) is a withholding statute within the meaning of Exemption 3. Nor does the DOJ show that the withheld information falls within the scope of § 3730(b), which states only that "[t]he complaint shall be filed *in camera* [and] remain under seal for at least 60 days". 31 U.S.C. § 3730 (b)(2). Moreover, the parties vigorously dispute the amount of information publicly available about sealed *qui tam* cases. Plaintiffs have adduced evidence that information about some *qui tam* cases is publicly available on PACER, including the docket number, the identity of the court in which the case is pending (including the judicial district), and the date the case was filed. According to

12

Kovakas, however, there are a number of sealed *qui tam* cases that he knows about through his communication with attorneys from the Civil Division which cannot be found on PACER because their existence is sealed from the public.  In view of the dispute regarding whether the information in fields identifying the court, judicial district, docket number, file date, start date, and disposition date of *qui tam* cases, is subject to court sealing orders, summary judgment is inappropriate.

### 3.    Internal Information

Notwithstanding the above, plaintiffs contend that among the fields at issue, there are two that contain internal information not subject to any seal: zstart_date and zdisposition_date.  Long explains in her declaration, that the Data Dictionary defines zstart_date as: "Start Date", the "Received Date for a Case/Stage".  In contrast, the zfile_date field is defined in the Data Dictionary and Case Classification Unit Procedures Manual dated January 26, 2007, as: "Filing Date", the "official date a case was filed in court".  Thus, Long asserts that zstart_date is not the official filing date recorded from a court's sealed case file, but is the date the DOJ began handling the case - - internal information not subject to a court seal.

Kovakas responds:

I was advised by OMI that the "start date" . . . refers to the date that a particular stage in a case begins, and that the date may be manually entered.  For sealed cases, the "start date" would most commonly be the trial court stage; thus the "start date" will often be the same as or very close in time to the filing date, and will thus convey information about the case itself.  Even if the "start date" reflects the start date of a different stage, it would then indicate a new stage in the case has begun, which will also reflect what is happening in the case.

8th Kovakas Decl. ¶ 17.

13

The zdisposition_date field contains the "Disposition Date".  The "Pre-Filing/Trial Stage Disposition and Relief Report" ("Disposition Form") indicates that the disposition date is the date of an event which disposed of a case.  The Disposition Form instructs that "the date of the disposing event; not the date of the form's completion" should be recorded.  The Disposition Form contains a number of codes for the events that dispose of a case, including: "Transferred to Agency"; "Delegated to U.S. Attorney"; "Settled"; "No Gov't Role"; "Defensive Matters"; "Disposed of by Court's Decision"; and "Voluntarily Dismissed".  Based on this evidence, plaintiffs argue that the zdisposition_date contains internal information that is not subject to a court seal.

In response, Kovakas avers that:

> [t]he "disposition date" could refer to the date of any disposition that occurs in a case, even where the disposition is not final, such as the date the court rules on a dispositive motion where the ruling does not end the case.  Even if the disposition date relates to a decision by the Division to transfer handling of the case to another Division, agency, or U.S. Attorney's Office, disclosure of the date will reveal something about the time period in which the case is being litigated, and how it is being handled.  In both instances the information relates directly to the sealed case and is not simply internal information that is generated without regard to events in the litigation.

8th Kovakas Decl. ¶ 17.

Although the DOJ argues that it is prohibited from disclosing any information about sealed and *qui tam* cases, the information in the zstart_date field is an internal recording of the date a particular stage in a case begins for the DOJ; there is no evidence this date is part of an official court record.  Further, even assuming the seal on a *qui tam* case acts to prohibit the DOJ from disclosing official information about a case, there is no evidence that the DOJ is enjoined from disclosing internal administrative information about a case.  Therefore, it must be disclosed under FOIA.

14

Kovakas's declaration indicates that the zdisposition_date field contains an internal reference date that may or may not reflect the official court status of a *qui tam* action. Either way, the date in this field represents an occurrence that the DOJ deems dispositive to the case. Thus, it is internal and, again, in the absence of evidence that any sealing orders bar the DOJ from disclosing its own internal information, it is subject to FOIA and must be disclosed.

### D. Amount Sought, Government Exposure, and Special Codes

The DOJ withheld information from the following fields: SGT_OPP_AMT, SGT_GOVT_AMT, and GOVT_EXPOSURE, pursuant to Exemption 5, which permits an agency to withhold "inter-agency or intra-agency memoranda or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).

According to Kovakas, the: SGT_OPP_AMT fields contain a dollar amount intended to reflect the amount sought by opposing parties in litigation with the Civil Division, "or, in a *qui tam* case, the amount sought by the relator, in a particular case"; SGT_GOVT_AMT fields "record a dollar figure intended to reflect the amount sought by the government in a particular case"; and the GOVT_EXPOSURE fields "records[] a dollar figure intended to reflect the government's financial exposure in a particular case." 7th Kovakas Decl. ¶ 15. Kovakas explains that he "withheld the data in these fields under Exemption 5 as protected under the deliberative process privilege and the attorney work product doctrine." 7th Kovakas Decl. ¶ 15. Kovakas "waived the applicable privileges for closed cases" and released the information when the field contained "a 'zero' or 'null' value". 7th Kovakas Decl. ¶ 15.

Exemption 5 protects from disclosure "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental policies

are formulated [the 'deliberative process privilege']." *Wood*, 432 F.3d at 83 (internal citation omitted); *see also* 5 U.S.C. § 552(b)(5). The Second Circuit has explained that "[c]ourts have interpreted Exemption 5 to encompass traditional common-law privileges against disclosure, including the work-product doctrine, and executive, deliberate process and attorney-client privileges." *Nat'l Council of La Raza*, 411 F.3d at 356 (2d Cir. 2005) (citing *Grand Cent. P'ship, Inc.*, 166 F.3d at 481).

Regarding the attorney work product privilege, the Second Circuit has explained that it:

> protects "the files and the mental impressions of an attorney ... reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways" prepared in anticipation of litigation. *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947). Although factual materials falling within the scope of attorney work product may generally be discovered upon a showing of "substantial need" under Fed.R.Civ.P. 26(b)(3), under exemption 5 the test is whether information "would 'routinely be disclosed' in private litigation." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 n. 16 (1975) (quoting H.R.Rep. No. 1497, 89th Cong., 2d Sess. 10 (1966)).

*A. Michael's Piano Inc. v. F.T.C.*, 18 F.3d 138, 146 (2d Cir. 1994). Thus, to justify nondisclosure under this exemption, the government must show that the material "(1) [is] a document or tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by or for his representative." *ECDC Envt'l v. N.Y. Marine & Gen. Ins. Co.*, No. 96 Civ. 6033, 1998 WL 614478, at *11 (S.D.N.Y. June 4, 1998).

1. **Initial Amount Sought - Fields 157-58**
   **Total Amount Sought - Fields 160-165, 168-169, 173, 177-179**
   **Government Exposure - Fields 159, 180-90**

According to Kovakas, many times, the initial amount sought by an opposing party or the government is not included in the initial pleading. In those instances, the dollar amount that appears in the fields at issue "is often an estimate by the assigned attorney, using his or her

16

judgment based on the theories that the opposition or the government is advancing in the litigation, and the facts of the case." 7th Kovakas Decl. ¶ 16. Kovakas further states that "even where the party in opposition does specify an 'amount sought' in the pleadings" if the Civil Division attorney "estimates the government's exposure as higher or lower than the amount that the party in opposition has indicated is being sought", that estimate will be entered in the initial amount sought field. 7th Kovakas Decl. ¶ 16. Kovakas avers that even if the information in the fields at issue is identical to the amount stated in the corresponding pleading, "it may indicate the attorney's judgment that the amount sought in the pleading is reasonable." 7th Kovakas Decl. ¶ 16. Kovakas explains that the DOJ uses "[t]he amounts in these fields, including estimates," to gauge "its success in litigating and settling cases, which may in turn contribute to decisionmaking in performance evaluation and resource allocation." 7th Kovakas Decl. ¶ 16. Additionally, Kovakas avers that "disclosure of this information while a case is ongoing could harm the Civil Division's litigation interests" and "chill assigned attorneys from recording their candid estimates of the government's exposure". 7th Kovakas Decl. ¶ 16.

In opposition, plaintiffs refer to the "Opposition and Government Relief Sought and Dollar Amount" section of the DOJ's 2007 Case Classification Manual. 6th Long Decl. ¶ 46, Ex. H. The manual instructs staff to enter a "Y" meaning "Yes, monetary relief sought" but "only if the complaint specifically states that monetary relief is being sought." 6th Long Decl., Ex. H, p.32. If monetary relief is sought but the amount is "unspecified or unable to be determined", a "U" for "Unknown" should be entered in the relief sought field. 6th Long Decl., Ex. H, p.32. The manual states that the "source" of this information is "[c]ase documents" and explains that "[m]ost suits have the relief information stated in the section at the end of the complaint called a

'prayer'". 6th Long Decl., Ex. H, p.31. The manual instructs that the number entered into the

"Dollar Amount" field should be "[r]ounded to the nearest whole dollar" and that staff should

"[e]nter only the figures appearing after terms such as sought, seek(s), seeking". 6th Long Decl.,

Ex. H, p.32. Plaintiffs argue that this manual establishes that the "amount sought" category

contains historical facts that are "drawn from publicly filed court complaints" and not subject to

Exemption 5. 6th Long Decl. ¶ 46.

Plaintiffs assert that fields 160-65, 168-69, 173, and 177-79, which contain the "total

amount sought" are different from fields 157-58, discussed above, which contain the "initial"

amounts sought. According to plaintiffs, the "total amount sought" category stores information

"input by Defendant at the time a case is disposed". 6th Long Decl. ¶ 48. Plaintiffs refer to the

instructions accompanying the "Pre-Filing/Trial Stage Disposition and Relief Report", in

Appendix D to the "Database Integrity Program - Procedures Manual", 6th Long Decl., Ex. I,

which directs staff to "[e]nter sought and awarded data for each type of relief the parties sought in

the case" and indicates that "[n]ormally, the relief sought amounts should come from the

plaintiff's amended complaint."

Kovakas responds that the instructions in the Case Classification Manual are irrelevant

because "after a CASES record is created, other contractors, from the Database Integrity (DBI)

Unit, regularly update the data in that record in consultation with the attorneys assigned to the

case." Kovakas 8th Decl. ¶ 22. Kovakas refers to § 1.3, "Overview of the DBI Program" of the

DBI Manual which states that:

> each member of the legal staff was assigned to a C[ase] M[anagement] A[nalyst] who
> is responsible for periodic review and update of all database information related to the
> caseload and activity time for each member of the legal staff. Through their regular

18

one-on-one interviews with the legal staff, CMAs have become the primary point of contact between the legal staff and O[ffice of] M[anagement] I[nformation].

6th Long Decl., Ex. I, p.4.   The "Overview" section states:

> For data entry purposes, CASES is divided into "case level" data and "stage level" data.  Case level data relates to information that's entered from the initial complaint received by the Division and additional information entered by the branches upon receipt of the official complaint from OMI.  A few examples of case level data are the DJNumber; Case Caption; Parties; Gov't Exposure; and Amounts Sought.  Once the CMAs become involved in a case, the majority of case level data should already be in the system.
>
> Stage level data are entered by branch personnel and also by the CMAs as they collect case tracking information from the attorney community.

6th Long Decl., Ex. I, pp.4-5.   Regarding "Relief Data", the DBI Manual instructs:

> In accordance with the Government Performance and Results Act (GPRA), the Division is required to meet certain goals established by DOJ.  Since one of the key standards involves dollars defeated, the role of the DBI Unit in verifying and investigating dollars sought claims by plaintiffs and in particular dollars defeated (government wins) has been significantly intensified.
>
> The Civil Division is called upon to report an accurate measure of dollars realistically defeated not purely a total of the lost or amount of damages gleaned from complaints.  For example, if a plaintiff alleges a multitude of claims seeking astronomical amounts in damages and the government wins, the Civil Division cannot necessarily claim an astronomical dollar win.  Instead it must show what the government realistically defeated.  Estimated amounts should be obtained from the attorney or reviewer responsible for the case, especially in large scale/multi-plaintiff cases.
>
> CMAs should use the following protocol whenever plaintiff's amount sought exceeds $5 million.  This protocol should be followed anytime during the litigation and the time of disposition.
>
> a.   Verify the amount sought matches the amount listed in the complaint.
>
> b.   Ask the attorney if the amount sought by the opposition is a realistic amount when compared to the estimated risk to the government.
>
> c.   Identify a government risk amount if possible.  Often times the attorney will not be able to arrive at a figure due to reasons such as: too early in the litigation to specify, the attorney is focused on the issues involved and not the amounts, or sometimes the attorney will not be comfortable identifying a figure.

6th Long Decl., Ex. I, pp.28-29.

Kovakas also responded to plaintiffs' reference to the "amount sought" entered at the disposition stage and explained that "even if '[n]ormally' the relief sought amount in the disposition specific tables should come from the plaintiff's amended complaint . . . these amounts would most likely be estimates if the assigned attorney had indicated an estimated amount sought earlier." 8th Kovakas Decl. ¶ 28.  Kovakas further states that his "consultation with the Division's litigating components has led me to conclude that a significant number of entries in the 'amount' sought field are attorney estimates."  8th Kovakas Decl. ¶ 28.

Plaintiffs argue in reply that the DOJ has failed to adduce any documentary evidence "calling for the entry of attorney - or any- estimates in the Amount Sought" fields.  7th Long Decl. ¶ 36.  Plaintiffs further argue that the manuals "make clear that personnel should not deviate from the written instructions".  7th Long Decl. ¶ 39.

The DOJ identifies field 159 as "Government Exposure Amount, based on attorney's estimate."  Dkt. No. 71-6.  Kovakas asserts that the DOJ properly withheld all the information in field 159 under Exemption 5 because it contains opinion work product or fact work product by attorneys in ongoing cases.  7th Kovakas Decl. ¶ 18.  According to Kovakas, this field "records a dollar figure intended to reflect the government's financial exposure in a particular case."  7th Kovakas Decl. ¶ 15.  Kovakas states that he released the data in this field for closed cases and when the field contained a "zero" or "null" value.  7th Kovakas Decl. ¶ 15.  The dollar amount in this field "is often an estimate by the assigned attorney using his or her judgment based on the theories that the opposition or the government is advancing in the litigation, and the facts of the case."  7th Kovakas Decl. ¶ 16.  Kovakas explains that the amounts in field 159 "reflect a litigating component's internal deliberations, as well as the mental impressions of the attorneys

handling the case at issue." 7th Kovakas Decl. ¶ 17.  Additionally, the DOJ uses these amounts to gauge its success in litigating and settling cases, "which may in turn contribute to decisionmaking in performance evaluation and resource allocation."  7th Kovakas Decl. ¶ 17.

In her declaration, Long points out that the 2001 DBI Manual instructs analysts to determine whether the amount sought by an opposing party is realistic only when the party seeks more than $5 million in the complaint.  6th Long Decl. ¶ 51.  Long argues that a single attorney's estimate "does not involve any consultative process among Division decisionmakers" and therefore does not qualify for exemption under the deliberative process privilege.  6th Long Decl. ¶ 53.  Long further argues that even assuming the information in field 159 is based on an attorney's estimate, the estimates are not made because of ongoing litigation but in order to comply with the Government Performance and Results Act of 1993 ("GPRA"), 31 U.S.C. § 1101 *et seq.*  6th Long Decl. ¶ 52.

Kovakas states, in reply, that Long's assertions regarding these fields are incorrect. Kovakas asserts that although the DBI Manual refers to complaints seeking more than $5 million in damages, the "instructions do not prohibit attorney assessments in other circumstances" and also state that "[e]stimated amounts should be obtained from the attorney or review responsible for the case."  7th Kovakas Decl. ¶ 24.

With regard to the GPRA, Kovakas replies that "Long has no personal knowledge of how CASES information is used, and the government's potential use of information in these fields for GPRA purposes does not contradict my conclusion that this information is protected from disclosure as attorney work product and deliberative information."  7th Kovakas Decl. ¶ 25.  Nor does Long, Kovakas states, have "personal knowledge of how attorneys assigned to a case make

21

assessments about the 'amount sought' and 'government exposure'" fields and therefore has "no basis for asserting that Civil Division attorneys never consult with each other when making such assessments."  7th Kovakas Decl. ¶ 26.

Long replies that: "Defendant's manuals make clear that personnel should not deviate from the written instructions, and they demonstrate that Defendant has established quality control procedures to ensure that such deviations so not occur."  7th Long Decl. ¶ 39.

The DOJ's manuals unequivocally state that when the amount in question (initial, total, or government exposure) is under $5 million, the dollar amount entered into the corresponding field must be derived from the complaint or amended complaint.  Therefore, the dollar amount entered in these fields are historical fact, not attorney opinion or work product within the meaning of Exemption 5.  Accordingly, the DOJ must disclose all dollar amounts in these fields that less than $5 million.  However, because the manuals require attorney review when the amount is over $5 million, the Court finds these amounts are attorney work product and fall within Exemption 5. Accordingly, the DOJ properly withheld these amounts.

### 4.    Special Codes - Fields 180-184

Kovakas withheld the "special codes" in fields 180-184 under Exemption 5.  In his declaration, Kovakas explains:

> I identified four codes that, if disclosed, would reveal the Civil Division's assessment of litigation risk.  These codes are (1) 504, which indicates that the opposition in an affirmative case is seeking a large damages award, which the Civil Division believes is accurate; (2) 505, which indicates that the opposition in a defensive case is seeking a large damages award, which the Civil Division believes is accurate; (3) 515, which indicates that the opposition is seeking an exaggerated amount, and the Civil Division believes the litigation poses no financial risk; and (4) 516, which indicates that the opposition is seeking an exaggerated amount, and the Civil Division believes the litigation poses some financial risk.  These codes are input into the CASES database

22

when a case is ongoing, and reflect the assigned attorney's assessment of litigation risk.

7th Kovakas Decl. ¶ 28.

Long does not take issue with Kovakas's assertions regarding special codes but argues that these codes are not used as part of the deliberative process in ongoing litigation but rather "to provide additional context for GPRA reports that draw data from that field, and to Defendant's quality assurance staff when they review the database for anomalies and inconsistencies."  6th Long Decl. ¶ 54.

"The attorney work product doctrine 'provides qualified protection for materials prepared by or at the behest of counsel in anticipation of litigation or for trial.'" *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2007) (quoting *In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2003*, 318 F.3d 379, 383 (2d Cir. 2003)).  "There are two types of work product, ordinary or fact (herein 'fact') and opinion." *Id*.  The Second Circuit has stated that "fact work product may encompass factual material, including the result of a factual investigation."  *Id*. Opinion work product, in contrast, "reveals the 'mental impressions, conclusions, opinions, or legal theories of an attorney or other representative,' and is entitled to greater protection that fact work product."  *Id*. (quoting *United States v. Adlman*, 134 F.3d 1194, 1197 (2d Cir. 1998)).  The party seeking protection for opinion work product must show "'a real, rather than speculative, concern' that the work product will reveal counsel's thought processes 'in relation to pending or anticipated litigation.'" *Id*. at 183-84 (quoting *In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2003*, 318 F.3d at 386).

The DOJ contends that the four special codes reflect the assigned attorney's assessment of the financial risk the litigation of a case poses to the government.  7th Kovakas Decl. ¶ 28.

23

Plaintiffs do not dispute that these codes reveal government attorneys' mental impressions. Rather, plaintiffs argue that these codes were prepared in compliance with the GRPA, and therefore not because of litigation.  Either way, it is undisputed that these codes reflect the opinions of government attorneys regarding the financial risk litigation poses to the government. Thus, disclosure of these codes would reveal the government attorneys' mental impressions "in relation to pending . . . litigation." *In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2003*, 318 F.3d at 386.  Accordingly, the DOJ has established that these codes are protected by Exemption 5.

### E.   Punitive Health Care Fraud Claims Act ("HCFCA")Award -  Fields 171, 175

According to Kovakas, the fields titled PUNITIVE_HCFCA_AWD (171, 175) "reflect the amount of a judgment or settlement in a health care fraud case that is designated as a particular type of damages award."  7th Kovakas Decl. ¶ 22.[6]  Kovakas asserts the information in this field is exempt from disclosure because "with respect to cases that result in a settlement, these breakdowns reflect an assessment by the assigned Civil Division attorney, after the parties have reached a preliminary settlement agreement, regarding what portions of the proposed settlement

---

[6]The DOJ previously released fields titled: PENALTIES _HCFA_AWD PUNITIVE_TREAS_AWD which "reflect the amount of a judgment or settlement in a health care fraud case that is designated as a particular type of damages award"; PENALTIES_TREAS_AWD, which "reflect the amount of a judgment or settlement in a non-health care fraud case that is designated as a particular type of damages award"; and COMP_DAMAGE_AWD and ATTORNEY_FEES_AWD, which reflect "the amount of a judgment or settlement in any type of case that is designated as a compensatory damages award or as an attorney fees award, respectively."  7th Kovakas Decl. ¶ 22.  Kovakas states that on review, he determined "all of these fields qualify as protected by the deliberative process privilege and attorney work product doctrine and thus should have been withheld pursuant to Exemption 5."  7th Kovakas Decl. ¶ 22.

amount should be characterized as a particular type of damages." 7th Kovakas Decl. ¶ 23.  To

illustrate, Kovakas explains that:

> the Civil Fraud Section and National Courts Section handle cases in which certain
> types of damages are allowed - such as single damages, triple damages, and attorney
> fees - pursuant to particular statutes, such as the False Claims Act and the Health Care
> Fraud False Claims Act.  Thus, the assigned attorney will indicate what portions of
> a proposed award should be considered to fall within the different categories of
> damages.  This determination is made during ongoing litigation, at the time the Civil
> Division is considering whether to authorize settlement in a particular case, and is
> presented in an internal memorandum seeking settlement authorization.  If settlement
> is authorized, the final decision does not incorporate this information but simply
> grants authority to settle the case for the entire settlement amount.

With respect to cases that result in a court judgment:

> the dollar figures in these fields sometimes reflect the court's breakdown of the
> damages award into single, multiple, compensatory, or punitive damages, penalties,
> or attorney fees.  However, courts sometimes do not give a breakdown of the damage
> award in their order . . . .  In those cases, the assigned Civil Division attorney may
> provide an assessment regarding what portions of the total damages should be
> characterized as single or multiple damages, as compensatory or punitive damages,
> or as penalties. . . .  The assessment occurs during or at the end of the district court
> litigation phase of the case, before the appeals period has ended.

7th Kovakas Decl. ¶ 24.

Kovakas believes that "[r]elease of this information could harm the Division's litigation

interests with respect to an ongoing case or future similar cases because it would provide

opposing parties with insight into how the Division evaluates awards, which they could use in

litigation or settlement negotiations."  7th Kovakas Decl. ¶ 25.  Additionally, Kovakas states,

"disclosure of this information might chill attorneys assigned to these cases from providing

candid assessments of award breakdowns."  7th Kovakas Decl. ¶ 25.

Plaintiffs respond that data-entry staff draw the amounts entered in this field from the

amounts in the Civil Fraud Disposition Report for each case.  *See* 6th Long Decl. ¶ 56, Ex. I,

Appendix D, p.5.  Therefore, plaintiffs argue, the amounts are historical facts, not attorney work product.  Plaintiffs further assert that these fields "are created in CASES to comply with a statutory command" by the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1128C, to deposit "a portion of the money obtained from civil fraud suits . . . into the Health Care Control Account to fund additional health care fraud investigations and prosecutions."  6th Long Decl. ¶ 60, 58.

Kovakas responds that he consulted with individuals in the Civil Division's Civil Fraud section and was informed that:

> Civil Fraud attorneys complete the Civil Fraud Disposition Report using the same amounts that they include in memoranda in which they make recommendations regarding settlement or appeal in a case.  The amounts on these Reports reflect determinations made while litigation is still ongoing, which are used in agency decision making about a case.  The amounts that attorneys record on the Civil Fraud Disposition Report are usually not identical to the amounts that are actually disbursed into the HCFCA because the final decision regarding the disbursement amount occurs at a later point . . . . [t]hey reflect a preliminary determination that may be different from the final decision.

8th Kovakas Decl. ¶ 33.

Long responds that "the information recorded in the 'Punitive HCFCA Award' fields - Defendant's allocation to the Health Care Control Account of funds to be recovered - occurs at the time of disposition, and so is a purely historical fact."  8th Long Decl. ¶ 42.

The Court finds that the amounts in the "Punitive HCFCA Award" fields include attorney breakdowns of proposed settlement amounts into the types of damages allowed by statute.  They also contain attorneys' division of a lump sum court ordered judgments into the various statutory categories.  Finally, in cases where the court issuing the judgment has divided the damages into the various categories, these fields include the amount of damages designated as punitive by the

court.  According to Kovakas, the attorneys divide lump sum judgments into statutory categories "so that its litigation success can be monitored, and decisions regarding strategy, appeal, settlement, performance evaluation, and resource allocation can take this information into account."  The Court finds that this information falls into the category of attorney work product and is therefore covered by Exemption 5.  Because it finds the DOJ properly withheld all the information in fields 171 and 175, the Court does not reach the issue of segregability.

### F.       Alien Registration Numbers - Fields 336-337

Pursuant to Exemption 6, the DOJ redacted fields 336-337, which contain alien registration numbers.  In her original declaration, Long stated:

> I have analyzed the records in V.I. 336-337 that contain a redacted entry, and found that virtually all (94%) of the Court of Appeals cases therein are appeals from the B[oard of] I[mmigration] A[ppeals]. Even as to the relatively few Court of Appeals cases where information as to the origin of the appeal is missing or unclear, the coding of other fields, such as the case type (ZCASE_TYPE), *see* Arvaneh Dec. Ex. A at line 192, typically indicate that the subject matter of the appeal pertains to immigration and is consistent with those cases having originated as BIA appeals. Thus, CASES obviously stores BIA docket numbers.

Long Decl. ¶ 122, Dkt. No. 30-3.

Despite giving the parties a number of opportunities to address this issue, the DOJ has yet to come forward with any explanation of where the alien registration numbers in this field came from.  Long stated in her original declaration that her analysis of the records in these fields indicates that these alien registration numbers are in fact BIA docket numbers.  Neither party has submitted any of these records for the Court's review.  If all of the information in these fields is recorded directly from current BIA docket numbers, which are already public, it would be hard to imagine that revealing these numbers a second time would implicate even *de minimis* privacy

interests.  In the absence of any facts regarding the provenance of the alien registration numbers in the CASES database, summary judgment would be in appropriate and is, accordingly, denied.

Alternatively, plaintiffs assert that, at a minimum, the last four digits of the alien registration numbers should be released.  Kovakas responds that he has not considered whether last four digits could be segregated and  would "need to consult again with individuals at other agencies in order to determine the privacy interests that might be implicated by release of the last four digits."  8th Kovakas Decl. ¶ 54. In view of the DOJ's lack of opposition and failure to submit any evidence showing that a *de minimis* privacy interest would be implicated by the release of the last four digits of the alien registration numbers at issue, the Court finds the DOJ has failed to show the last four digits are protected from disclosure by Exemption 6.[7] Accordingly, plaintiffs' motion for summary judgment and request for release of the last four digits of the alien registration numbers contained in CASES is granted.

**G.    Government Employee Representation Information - Fields 340-343, 346-347**

Plaintiffs seek the names of government employees who have been sued in their individual capacities and requested government representation.  Although it has not provided the employees' names, the DOJ has already disclosed the government's response to each request and the information identifying the agency that employs the individual who made the request.  8th Kovakas Decl. ¶ 58. The DOJ withheld these names pursuant to Exemption 6 and asserts that release of these names would cause a clearly unwarranted violation of personal privacy because

---

[7]Nor has the DOJ adduced any evidence indicating that the last four digits are not reasonably segregable.

the individuals whose requests the government has denied would be stigmatized and subject to "negative speculation".

FOIA Exemption 6 protects against disclosure that implicates personal privacy interests. The government may withhold records in "personnel and medical files and similar files" only when their release "would constitute a *clearly unwarranted* invasion of personal privacy." 5 U.S.C. § 552(b)(6) (2006) (emphasis added). "Exemption 6 is intended to 'protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information.'" *Wood v. FBI*, 432 F.3d 78, 86 (2d Cir. 2005) (quoting *U.S.Dep't of State v. Washington Post Co.*, 456 U.S. 595, 599 (1982)). To determine whether names and other records at issue may be withheld under Exemption 6, the Court must: (1) "determine whether the personal information is contained in a file similar to a medical or personnel file", that is, "whether the records at issue are likely to contain the type of personal information that would be in a medical or personnel file"; and (2) "balance the public's need for the information against the individual's privacy interest to determine whether the disclosure of the names would constitute a 'clearly unwarranted invasion of personal privacy.'" *Id*. (quoting 5 U.S.C. § 552(b)(6)).

It is well established that identifying information such as names, addresses, and other personal information falls within the ambit of privacy concerns under FOIA. *See Dep't of Air Force v. Rose*, 425 U.S. 352, 380-81 (1976); *Fed. Labor Relations Auth. v. U.S. Dep't of Veterans Affairs*, 958 F.2d 503, 510-11 (2d Cir. 1992) (recognizing privacy interest in names and addresses of federal employees). "[T]he focus, in assessing a claim under Exemption 6, must be solely upon what the requested information *reveals*, not upon what it might lead to." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 180 (1991) (Scalia, J. concurring) (emphasis in the original).

Plaintiffs do not dispute that the information at issue falls within the ambit of personnel files or similar files.  The information in fields 340-43, 346-47, if disclosed, would reveal the names of government employees who have been sued, that they have requested government representation, and whether the government granted or denied their requests.

Plaintiffs contend that the "public has a keen and substantial interest in determining whether those representation decisions were administered fairly" and whether government funds and resources were allocated fairly.  7th Long Decl. ¶ 58.  Plaintiffs further assert that "by looking at the names alone Plaintiffs will be able to examine the number and frequency of requests made by each Government employee and analyze whether those factors affect the Government's decision to grant or deny representation."  7th Long Decl. ¶ 59.

The Court begins its analysis by considering whether disclosure implicates "more than a *de minimis* privacy interest".  *Federal Labor Relations Auth.*, 958 F.2d at 510.  The Second Circuit has explained that "the notion of privacy 'encompasses the individual's control of information concerning his or her person,' and . . . even though 'an event is not wholly private it does not mean that an individual has no interest in limiting disclosure or dissemination of the information.'"  *Id*. (quoting *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989) (internal quotation marks and alteration omitted)).

Plaintiffs argue that any privacy interest is negligible in this arena because the fact that a specific government employee has been "accused of wrongdoing is a matter of public record, as is his or her personal identifying information."  Dkt. No. 76-48.  That the employees at issue may have been identified as defendants in civil filings, however, does not mean they have no privacy interest in preventing disclosure.  *See, e.g., Fed.Labor Relations Auth*., 958 F.2d at 511 (finding

that the previous public availability of the did not mean "that there is no privacy interest in preventing disclosure.") (citing *Reporters Committee*, 489 U.S. at 767). "[T]he public availability of the information sought must be measured in terms of the 'defining characteristic' associated with the list", *id*., which, in this case, is the request for government representation.

Although the DOJ has released all determinations of whether they provided representation and the identity of the agency employing the individual who made the request, it has not released the names of those individuals. 8th Kovakas Decl. ¶ 58. The DOJ contends that revealing this information would expose the individual employees to "potential harassment and stigma" because in the instances when the government has denied an employee's representation request, it would "suggest a determination that representation [of a particular individual] is not 'in the interest of the United States'". 8th Kovakas Decl. ¶ 58 (quoting 28 C.F.R. § 50.15).[8] Plaintiffs add that a denial may also be premised on a finding that an employee's actions were outside the scope of

---

[8]The Code of Federal Regulations states:

(b) Representation is not available to a federal employee whenever:
>    (1) The conduct with regard to which the employee desires representation does not reasonably appear to have been performed within the scope of his employment with the federal government;
>    (2) It is otherwise determined by the Department that it is not in the interest of the United States to provide representation to the employee.

28 C.F.R. § 50.15 (b).

employment or because there is a conflict of interest,[9] and argue that there is nothing stigmatizing about being denied representation on either of these premises.

In balancing a government employee's privacy interests against the public's interest in disclosure, a court should consider several factors, including:

> (1) the government employee's rank; (2) the degree of wrongdoing and strength of evidence against the employee; (3) whether there are other ways to obtain the information; (4) whether the information sought sheds light on a government activity; and (5) whether the information sought is related to job function or is of a personal nature. The factors are not all inclusive, and no one factor is dispositive.

*Perlman v. U.S. Dep't of Justice*, 312 F.3d 100, 107 (2d Cir. 2002).

In this case, there is no evidence regarding the rank of any of the employees who have requested government representation.  Likewise, there is no evidence regarding the degree of wrongdoing or the strength of the evidence against any of the employees identified in the lawsuits.  There are other ways to obtain the information, as plaintiffs have demonstrated, *i.e.*, by obtaining court documents.  The identification of the employees who requested government representation sheds little light on government activity, particularly since the DOJ has already disclosed all of its determinations.  Finally, the information sought is of a personal nature.  Even assuming the first two factors weigh in favor of disclosure, the latter three do not.  Accordingly, the Court finds that the DOJ is entitled to summary judgment with regard to its decision to withhold the names of the individuals whose requests for representation it denied.

---

[9]Section 50.15(a)(10) states that when conflicts of interest exist which cannot be otherwise resolved, "direct Justice Department representation [may] be withheld" and private representation at federal expense be provided.  *See also* 28 C.F.R. § 50.16 (representation of federal employees by private counsel at federal expense).

The DOJ withheld the identities of all government employees who requested representation, including the names of those whose requests had been granted.  Kovakas explained that if it released the names of the employees whose requests had been granted, the identities of the individuals whose requests were denied would be "revealed by their omission".  8th Kovakas Decl. ¶ 8The Court can only conclude that because the disclosure of these names would identify the employees' whose requests were denied, the DOJ's decision to withhold all names was proper.

### H.        Matter Number - Field 346

The DOJ also withheld the "matter number", field 346, because, if disclosed, it would link the information regarding the government's determination of employees' requests for government representation to database fields in the primary CASES tables", which contains case captions and the names of all parties in a case.  7th Kovakas Decl. ¶ 34. "Disclosure of the 'matter number' field would thus automatically reveal that the individually-named defendant in a particular case had been sued in an individual, rather than official, capacity".  7th Kovakas Decl. ¶ 34.  The "matter number" is a system generated internal agency file number that is assigned to each civil case in the CASES database.

Plaintiffs argue that the "matter number" field does not meet the threshold requirement of Exemption 6 because it does not qualify as personnel and medical files and similar files.  The Court agrees.  There is no evidence that it is assigned to individual employees or that a separate matter number is assigned to each employee's request for government representation.  While a matter number may link fields or tables within CASES together, it does not reveal anything about an individual employee; it is as series of numbers linked to a case that may involve a number of

individuals.  "[T]he focus, in assessing a claim under Exemption 6, must be solely upon what the requested information reveals, not upon what it might lead to." *Ray*, 502 U.S. at 180 (Scalia, J. concurring) (emphasis in the original).  Accordingly, the DOJ's motion for summary judgment on the issue of field 346, matter number, is denied and plaintiffs' cross-motion for summary judgment the issue of field 346, matter number, is granted.

## IV.    MOTION FOR RECONSIDERATION

In the Memorandum Decision and Order entered on March 25, 2010, the Court granted summary judgment for the DOJ in connection with the adequacy of the DOJ's search for, and the DOJ's decision to withhold pursuant to Exemption 2, JCON IDs.  According to the DOJ, JCON IDs are "internal identification codes" that the Division uses "as a means of identifying employees" and "as login identification codes that allow access to the Division's network".  Presently before the Court is plaintiffs' motion pursuant to Rule 54(b) of the Federal Rules of Civil Procedure for reconsideration of the Court's decision to grant the DOJ's motion for summary judgment with respect to JCON IDs.  Plaintiffs request that the Court reconsider its ruling on the issue of JCON IDs in light of the Supreme Court's decision in  *Milner*, -- U.S.--, 131 S.Ct. 1259, which rejected the interpretation of Exemption 2 held by four Courts of Appeals, including the Second Circuit.  Acknowledging that under *Milner*, Exemption 2 does not apply to JCON IDs, the DOJ does not oppose plaintiffs' request for reconsideration but asserts it is entitled to withhold JCON IDs pursuant to Exemptions 3, 4, 5, 6, and 7(A), (C), (D).  Plaintiffs oppose the DOJ's attempt to claim new exemptions and argue, in the alternative, that none of these exemptions permit the withholding of JCON IDs.

To warrant reconsideration, a party must show an intervening change in controlling law, the availability of previously unavailable evidence, or the need to correct a clear error of law or prevent manifest injustice, *see Doe v. New York City Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir. 1983).

In the *Judicial Watch v. Dep't of Army*, 466 F. Supp.2d 112, 123-24 (D.D.C. 2006), the court discussed the belated raising of FOIA exemptions:

> In the FOIA context, an agency may waive the right to raise certain exemptions if it fails to raise them prior to the district court ruling in favor of the other party. *P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 580 (D.C.Cir.1987) (stating that "agencies may not make new exemption claims to a district court after the judge has ruled in the other party's favor") (quoting *Holy Spirit Ass'n v. CIA*, 636 F.2d 838, 846 (D.C.Cir.1980)).  Nonetheless, motions to reconsider interlocutory orders may allow more room for discretion in terms of waiving exemptions. *Williams v. FBI*, No. 91-1054, 1997 WL 198109, at *2 (D.D.C. Apr. 16, 1997) (noting that the rule on waiver of FOIA exemptions is unclear with regard to motions for reconsideration and "[a]rguably, the policy militating against piecemeal litigation is less weighty where the district court proceedings are not yet completed"); *but see Scheer v. U.S. Dep't of Justice*, No. 98-1613, slip op. at 405 (D.D.C. July 14, 1994) (denying a motion for reconsideration to present new exemption claims, partly because the defendant did not show "why, through the exercise of due diligence, it could not have presented this evidence before judgment was rendered").  Circumstances in which an agency may belatedly invoke FOIA exemptions include a substantial change in the factual context of a case, an interim development in an applicable legal doctrine, or pure mistake. *August v. FBI*, 328 F.3d 697, 700 (D.C.Cir.2003).  Furthermore, the court may, *sua sponte*, "apply the law in order to achieve a just result." *Williams*, 1997 WL 198109, at *2.

*Judicial Watch v. Dep't of Army*, 466 F. Supp.2d 112, 123-24 (D.D.C. 2006).

The Court finds that because the district court proceedings in this case are not complete and because the Court previously ruled in the DOJ's favor on the issue of JCON IDs, the DOJ's belated assertions of other exemptions is permissible.

Although the DOJ now argues that five other FOIA exemptions apply to JCON IDs, the Court need only address Exemption 6.  JCON IDs are "internal identification codes" that the

Division uses "as a means of identifying employees" and "as login identification codes that allow access to the Division's network". The DOJ asserts that it has assigned a JCON ID to each individual who uses its computer systems in order to prevent unauthorized access.

At the threshold, the Court finds that JCON IDs implicate more than a *de minimis* privacy interest. DOJ employees are assigned unique identifiers which they use as login identification to access the CASES database. Of the 136 fields containing JCON IDs, eight contain the JCON IDs of attorneys, and 128 contain the JCON IDs of DOJ staff who create, edit, or close CASES database records. The Court finds that the individuals to whom the login identifications belong have a privacy interest in the withheld JCON IDs.

Next, the Court must consider whether the public interest in disclosure of the JCON IDs outweighs the employees' personal privacy interests. On this score, the Court previously noted that "plaintiffs seek disclosure of the JCON ID fields solely to determine which attorney is handling each filed case and not because any JCON ID intrinsically discloses anything about the workings of the agency." *Long v. Department of Justice*, Dkt. No. 43, p. 20, Mar. 25, 2010. Indeed, the DOJ has released attorney name, hire date, and term date information in lieu of JCON IDs in connection with the six database fields for which plaintiffs have requested such information. In the absence of any public interest in the disclosure of JCON IDs, the Court finds that employees' personal privacy interests outweigh the public interest in disclosure. *See, e.g., Strunk v. U.S. Dep't of State*, - - F.Supp. 2d - -, Civil Action No. 08-2234(RJL), 2012 WL 562398, at * 5 (D.D.C. Feb. 15, 2012) (finding that because employees of the United States Customs and Border Protection had a privacy interest in the "unique characters constituting a terminal user ID which is generally assigned to a single person or system user" and the plaintiff

had failed to articulate any public interest in disclosure, the government properly withheld

"terminal user IDs" under Exemption 6.  Accordingly, JCON IDs are properly withheld under

Exemption 6.

**V.      CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that the DOJ's motion for summary judgment (Dkt. No. 71) is granted with

respect to its decision to withhold Special Codes, Fields 180-184; HCFCA Awards, Fields 171,

175; and the names of employees requesting government representation; and

it is further

**ORDERED** that the DOJ's motion for summary judgment (Dkt. No. 71) is otherwise

denied in its entirety; and it is further

**ORDERED** that plaintiffs' cross-motion for summary judgment (Dkt. No. 76) is granted

with respect to their FOIA requests for internal information regarding sealed and *qui tam* cases;

the Initial Amount Sought, Fields 157-58; the Total Amount Sought, Fields 160-165, 168-169,

173, 177-179; and Government Exposure, Fields 159, 180-90; the last four digits of alien

registration numbers; and Matter Numbers, Field 346; and it is further

**ORDERED** that plaintiffs' cross-motion for summary judgment (Dkt. No. 76) is

otherwise denied in its entirety; and it is further

**ORDERED** that plaintiffs' motion for reconsideration (Dkt. No. 59) is granted; and it is

further

**ORDERED** that, based on Exemption 6, the Court reaffirms its prior decision (Dkt. No. 43) to the extent it granted the DOJ summary judgment on the issue of JCON IDs, and denied plaintiffs' cross-motion for summary judgment on the issue of JCON IDs.

**IT IS SO ORDERED.**

Date:   March 31, 2012

Honorable Norman A. Mordue
U.S. District Judge